```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

    _____
 3                                  )
    UNITED STATES OF AMERICA        )
 4        v.                        )  Case No. 8:21-cr-00308-PX-1
    VALFONSO DEWITT,                )
 5                  Defendant.      )
    _____)
 6
                                    Greenbelt, Maryland
 7                                  June 20, 2023
                                    2:53 p.m.
 8
                         SENTENCING HEARING
 9            BEFORE THE HONORABLE PAULA XINIS

10                   A P P E A R A N C E S

11  ON BEHALF OF THE GOVERNMENT:

12       U.S. ATTORNEY'S OFFICE
         6406 Ivy Lane, Suite 800
13       Greenbelt, Maryland  20770
         BY:  JEFFREY J. IZANT, ASSISTANT U.S. ATTORNEY
14            (301) 344-4433
              jeffrey.izant@usdoj.gov
15       BY:  GEONARD FLAY BUTLER II,
                 SPECIAL ASSISTANT U.S. ATTORNEY
16            (301) 344-0113
              geonard.butler@usdoj.gov
17
    ON BEHALF OF THE DEFENDANT:
18
         LAW OFFICES OF ALFRED GUILLAUME III, LLC
19       1350 Connecticut Avenue, N.W., Suite 308
         Washington, D.C.  20036
20       BY:  ALFRED GUILLAUME III, ESQUIRE
              (202) 321-0549
21            ag3law@gmail.com

22  ALSO PRESENT:  SPECIAL AGENT FERNANDO JARAMILLO - DEA

23
                      PATRICIA KLEPP, RMR
24                   Official Court Reporter
                  6500 Cherrywood Lane, Suite 200
25                   Greenbelt, Maryland  20770
```

```
 1                       P R O C E E D I N G S

 2        (Call to order of the Court.)

 3             THE COURTROOM DEPUTY:  All rise.  This Honorable Court

 4   resumes in session, the Honorable Paula Xinis presiding.

 5             THE COURT:  Good afternoon, everyone.

 6        (All responding:  Good afternoon, Your Honor.)

 7             THE COURT:  You all can have a seat.

 8             Will the government call the case.

 9             MR. IZANT:  Yes, Your Honor.  This is United States of

10   America v. Valfonso Dewitt, Criminal No. PX 21-308.  On behalf

11   of the United States, I'm Assistant U.S. Attorney Jeff Izant,

12   and I'm joined at counsel's table by AUSA Geonard Butler.  Good

13   afternoon.

14             THE COURT:  Okay, good afternoon.

15             MR. BUTLER:  Good afternoon, Your Honor.

16             MR. GUILLAUME:  Good afternoon, Your Honor.  For the

17   record, representing Valfonso Dewitt, Alfred Guillaume.

18             THE COURT:  Okay, good afternoon.  Just give me one

19   second.

20             Okay.  So Mr. Dewitt, today is your sentencing.  My

21   first question for you is, have you had enough time to review

22   the presentence report that was prepared in your case and

23   discuss it with your counsel?

24             THE DEFENDANT:  Yes, I have.

25             THE COURT:  Okay.  I did receive, Mr. Dewitt, a letter
```

1    that I believe you must have had arranged to have been written

2    for you, is that accurate, at ECF 150?

3                MR. GUILLAUME:  Court's brief indulgence, Your Honor.

4                THE COURT:  Sure.

5          (Conference between Mr. Guillaume and the defendant.)

6                THE DEFENDANT:  Yes.

7                THE COURT:  Okay.  And I note that -- and I'm just

8    going to just sort of generally characterize it -- it's a letter

9    that generally objects to the presentence report.

10               Do I have that right, Mr. Guillaume?

11               MR. GUILLAUME:  Yes, Your Honor.

12               THE COURT:  Okay.  The generalized nature of it

13   doesn't really give me any -- any cause for concern in terms of

14   the presentence report on the whole.  The objections, if they're

15   going to be lodged, need to be specific, and they need to be

16   such that I can actually rule on disputed questions of fact.

17               And I also note that you have counsel in

18   Mr. Guillaume, so, Mr. Guillaume, I'll turn to you and ask you,

19   do you have any objections on behalf of Mr. Dewitt for the

20   presentence report?

21               MR. GUILLAUME:  No, Your Honor, I do not.

22               THE COURT:  Okay.  Government, same question.

23               MR. IZANT:  No objections, Your Honor.

24               THE COURT:  All right.  So Ms. Dasovic, thank you so

25   much for a well done report.  I very much appreciate it.  I

```
 1    adopt it in total.
 2            I'll note that as to Count One, the -- there is a
 3    mandatory minimum of 121 -- 120 months.  It's a Class A felony
 4    for conspiracy to distribute and possess with intent to
 5    distribute a controlled substance, with a triggering amount
 6    triggering a ten-year mandatory minimum.  The guideline range in
 7    this case is key to an offense level 32 and a criminal history
 8    category II, which means that at least the guidelines are
 9    135 months on the low end to 168 months on the high end.
10            I've read all of the submissions.
11            So I'll hear from Government first, then you,
12    Mr. Guillaume, and finally, if Mr. Dewitt wishes to be heard,
13    okay?
14            MR. IZANT:  Thank you, Your Honor.  As the Court has
15    observed, the defense is asking for the mandatory minimum
16    sentence, and the government is asking for the bottom of the
17    guidelines range to be imposed, which is also the
18    Probation Office's recommendation, so the difference here is
19    only 15 months.
20            THE COURT:  Mm-hmm.
21            MR. IZANT:  And the government's position is that the
22    mandatory minimum sentence is inappropriate in this case.  The
23    mandatory minimum sentence could be applied to a theoretical
24    defendant with no criminal history, 80 percent of the amount of
25    fentanyl as was involved in this case, and no leadership
```

1    enhancement, and no presence of actual leadership or managerial

2    control.

3              This defendant by contrast had 125 percent of the

4    mandatory minimum quantity and 125 percent of the bottom of the

5    offense level that's applied in this case.  This defendant has a

6    drug trafficking history, including most recently a 14-year

7    sentence.

8              THE COURT:  Wait, where is the 14-year sentence?

9              MR. IZANT:  This is in the PSR, Your Honor, at -- I

10   can get you the paragraph citation here.  The -- paragraph 45.

11   It looks like the defendant served approximately 14 years in --

12             THE COURT:  Yeah.  That can't be right, though,

13   because the next paragraph, he's out in 1994.

14             MR. IZANT:  He was sentenced and served a sentence for

15   paragraph 45 after paragraphs 46 and 47.

16             THE COURT:  I see.  But it says --

17             MR. IZANT:  But the date of offense was before.

18             THE COURT:  Okay.  So -- you know, and it's

19   interesting that you bring this up, because I had a question

20   about that offense.  Am I reading it right that a 14-year

21   sentence for possession of 2 ounces of a drug, simple

22   possession, is that -- I mean, can that really be right?

23             MR. IZANT:  Your Honor --

24             THE COURT:  I mean, there's not any -- it says "Due to

25   the age of the case, the circumstances of the case are unknown."

1          MR. IZANT:  I don't have an answer for Your Honor on

2    that.  We couldn't find any more information about this case

3    than Probation could, but I'd simply point out that the

4    defendant was in custody for this period of time.  Whether that

5    was an appropriate sentence, whether it was commensurate with

6    the nature of his offense, I have -- I have no information about

7    that, but the point was, this defendant was incarcerated for

8    14 years, for a drug trafficking offense.

9          THE COURT:  Do you have confirmation of that?

10          MR. IZANT:  That he was, in fact, other than this

11    report?

12          THE COURT:  Yeah.

13          MR. IZANT:  We obtained the charging documents,

14    Your Honor, but we did not obtain any confirmation of the term

15    of imprisonment.

16          THE COURT:  Okay.  Well, before we -- we cite it as a

17    fact beyond change, let's -- let's just check in with Probation,

18    and he has --

19          MR. IZANT:  The defendant hasn't disputed this.  He's

20    not objected to the PSR, and the PSR says he served 14 years,

21    unless you --

22          THE COURT:  But it just -- but I've got to tell you,

23    like, it is -- it is a remarkably draconian sentence if,

24    in fact, it's true, which leads me to want to know, when the

25    presentence report says, "Due to the age of the case,

 1   circumstances of the offense are unknown," I need to probe; I
 2   can't just accept it as true.
 3            Mr. Guillaume?
 4            MR. GUILLAUME:  Your Honor, if I could -- I think I
 5   can shed a little light on it --
 6            THE COURT:  Okay.
 7            MR. GUILLAUME:  -- but I don't have a 100 percent
 8   answer either, neither does Mr. Dewitt.  Your Honor, he did
 9   serve approximately 14 and a half -- 15 years previously.
10            THE COURT:  Okay.
11            MR. GUILLAUME:  Now, the underlying facts are -- have
12   been in dispute.  I believe that the Court reads it correctly
13   that the amount of alleged or proven narcotics is very low, very
14   minimal, but there is an issue that I have not been able to
15   verify, that my client tells me that there was something going
16   on with the -- with the sentencing, with the prosecutor at the
17   time, and because of the -- because of my client's, I guess -- I
18   don't want to insult him, but lack of education and
19   understanding of the court --
20            THE COURT:  Yeah.
21            MR. GUILLAUME:  -- and my not being able to go back
22   that far and look, to confirm, one way or the other, what
23   exactly happened; I had to take him at his word.
24            THE COURT:  So you don't dispute, then, that
25   Mr. Dewitt began serving the sentence on a 1989 offense in 2000

1    as the government says, and then served approximately 15 years?

2         MR. GUILLAUME:  He did serve approximately 15 years.

3    Let me just confirm the date that that began, Your Honor.

4         THE COURT:  Okay.  Because the reason why in my view

5    that's important is, then, the subsequent offenses happened, I

6    guess, before he adjudicated 45, and so I'm just trying to piece

7    it together; it would just be helpful.

8         MR. GUILLAUME:  If I could have the Court's brief

9    indulgence, Your Honor.

10        THE COURT:  Sure.

11        (Conference between Mr. Guillaume and the defendant.)

12        MR. GUILLAUME:  Your Honor, it is correct that he

13   began serving the sentence in 2000, but apparently, there was --

14   the sentence that he received was a combination of federal and a

15   state sentence, he believes, 52 months in the federal -- for the

16   federal sentence -- I mean, again, this is coming from him.

17        Court's brief indulgence.

18        THE COURT:  Well -- yeah, I don't -- I don't know,

19   because it doesn't totally line up with paragraphs 46 and 47.

20        (Conference between Mr. Guillaume and the defendant.)

21        MR. GUILLAUME:  So you know, I don't want to misspeak

22   and say something that's not been confirmed.

23        THE COURT:  Yeah.

24        MR. GUILLAUME:  So I will just say that I think

25   everything reads correctly in the PSR with respect to the time

```
 1    that was served and the amounts that were alleged.  As far as
 2    the sentencing parties --
 3              THE COURT:  Yup.
 4              MR. GUILLAUME:  -- it's a little confusing to me
 5    as well --
 6              THE COURT:  Okay.
 7              MR. GUILLAUME:  -- but he did serve approximately 15
 8    years.
 9              THE COURT:  Let me ask Ms. Dasovic what if any
10    documents you were able to obtain with respect to paragraph 45,
11    that conviction and sentence.
12              THE PROBATION OFFICER:  Your Honor, I -- I know that
13    on his rap sheet, it lists the information that I have in the
14    report, which is the day of conviction, the -- that the sentence
15    was five years to life, and then the release date in 2014.  I
16    did ask that district to conduct a collateral check for us, to
17    obtain records for us, which apparently they don't do, so I
18    wrote to the Court myself and requested it.  I don't have their
19    response with me, but I believe they told me they didn't have
20    records available, which is why I put that in the report.  I
21    just don't -- I can't seem to find it in the actual response
22    that was sent.
23              THE COURT:  Okay.  So then let me ask it from a
24    different angle, which is, as to paragraphs 46 and 47, each note
25    a federal offense, 46 for distribution of a controlled substance
```

1    in the Western District for Tennessee, and then a failure to

2    appear in the same district.  Both indicate a release date of

3    January 25, 1999 and an expiration of supervised release of

4    1/6/2002.  Were you able to get confirmatory records for those

5    cases?

6            THE PROBATION OFFICER:  So I called those offices, and

7    basically, they had the defendant on administrative probation,

8    nobody was supervising him, because after he finished his

9    federal sentences, he went into custody in New York on the state

10   case --

11           THE COURT:  Okay.

12           THE PROBATION OFFICER:  -- to serve his lengthy

13   sentence, so he wasn't actually -- nobody was supervising him,

14   because he was serving his sentences.  So once the years

15   expired, it was lifted.

16           THE COURT:  And you did get confirmation of that?

17           THE PROBATION OFFICER:  I did.

18           THE COURT:  That's very helpful, thank you.

19           So back to what you were telling me, Mr. Izant, I feel

20   like I've probed it and now have some confirmation that the

21   sentences were flipped; even though the one at 45 predated --

22   the offense conduct predated 46 and 47, Mr. Dewitt served them

23   in reverse order, and we have confirmation from the federal

24   case, so --

25           MR. IZANT:  That's correct.

1          THE COURT:  And no objection from the defense.  So if

2    you want to continue.

3          MR. IZANT:  That's right.  Thank you, Your Honor.

4          So I was pointing out that unlike a hypothetical

5    defendant to which the mandatory minimum could apply, this

6    defendant does have a criminal history, including that New York

7    sentence, including another federal distribution sentence.  And

8    he was, of course, the leader, manager, or supervisor of

9    James Gatson in this conspiracy.

10          And we also submit, Your Honor, that the defendant's

11   age is not such a significant mitigating factor as to require

12   the imposition of the mand min versus the low end of the

13   guidelines range.  And while increasing age is typically

14   associated with a reduced risk of recidivism, this defendant's

15   conduct in this case is a striking counterexample.

16          Now, I know there's actually some ambiguity as to the

17   defendant's exact date of birth.  The official date of birth in

18   the PSR is in 1950, but the defendant has provided numerous

19   dates of birth in the past to authorities, and Probation's

20   justification for a recommended sentence indicated the defendant

21   was -- is currently 74 years old, so if he's 74 now, that means

22   his date of birth is in 1948.  If his date of birth is actually

23   in 1950, he's about 72 years old right now.

24          THE COURT:  Either way, he's going to be in his 80s.

25          MR. IZANT:  Either way, he might be close to his 80s,

1    Your Honor.  I think if the defendant received just the

2    mandatory minimum sentence, and is given credit for all the time

3    he served in this case, and receives good time credit, this

4    defendant would be out before he's 80 years old.

5              THE COURT:  So tell me -- let's do it this way.  Tell

6    me why 120 months, ten years, for a man in his 70s, is not -- is

7    not punitive enough for this case involving, no doubt, a very,

8    very, very dangerous drug, but a single very failed attempt.  I

9    mean, you all were all over these two.  I mean, their whole

10   conspiracy is on wire.  It was pretty unsophisticated, if you

11   will, no -- no drug -- no violence, no guns.

12             And I am at least tentatively persuaded that --

13   there's some pretty good statistical studies which demonstrate a

14   reduced life expectancy because of the nature of confinement.

15   It just is what it is.  So why isn't 120 months, given those

16   facts, sufficient?

17             MR. IZANT:  Well, Your Honor, in this case -- I don't

18   know if I agree that this was an unsophisticated operation.  The

19   only reason that it was revealed to be unsophisticated is

20   because law enforcement was doing such a good job.  If it

21   weren't for the wiretap -- this involved numerous people,

22   transportation of drugs all around the country.  The defendant

23   started in New York, came to Florida, went to Tennessee, and

24   then distributed to Maryland, so this was not some street

25   hustle.

1    In addition to that, Your Honor, this defendant was

2    either 69 or 71 at the time he committed the offense and was

3    able to do so purely through using his cell phone, and the only

4    reason he didn't succeed was because of the wiretap.  I don't

5    know that the fact that law enforcement was so diligent suggests

6    that the defendant is not likely to recidivate.  As a matter of

7    fact --

8            THE COURT:  No, I think the things that I remember

9    from the trial are, you know, handing Mr. Gatson a trash bag of

10   money in open -- you know, like daylight, during a very public

11   funeral.  You know, there wasn't any sort of -- that I recall --

12   you can tell me if I'm wrong -- but any, you know, sophisticated

13   countersurveillance or, you know, a whole lot of subterfuge

14   here.

15           Anyway ...

16           MR. IZANT:  Your Honor's point is fair.  I think

17   that's an accurate observation of what the evidence at trial

18   showed, but this defendant, I submit, would not have stopped if

19   it weren't for the wiretap.  And in fact, even after his

20   codefendant was arrested, he spent a lot -- a lot of time on the

21   phone trying to explain to the defendant why this conspiracy

22   would continue --

23           THE COURT:  True.

24           MR. IZANT:  -- and the fact that their mission wasn't

25   done just because Mr. Gatson had been arrested.  Even to this

1    date, I think there's no evidence that this defendant has

2    accepted responsibility for his conduct, and the failure to

3    accept responsibility also weighs in favor of a stronger

4    likelihood of recidivism.

5            And so for all those reasons, we think just

6    punishment, deterrence, and protecting the public require at

7    least a bottom-of-the-guidelines sentence.

8            THE COURT:  Okay.

9            MR. IZANT:  Thank you, Your Honor.

10           THE COURT:  All right, thank you.  Mr. Guillaume?

11           MR. GUILLAUME:  Yes, Your Honor.

12           Your Honor, with all due respect, I do disagree with

13   government counsel.  I think, starting off with the number of 15

14   months to a man -- just to confirm for the record, my client is

15   74 years old.

16           Is that right, Mr. Dewitt?

17           THE DEFENDANT:  That's right.

18           MR. GUILLAUME:  It's 1948.  I think I may have missed

19   if it was written in the -- I didn't catch that, but 1948 is his

20   date of birth.

21           THE COURT:  Is there a confirmation on that, just -- I

22   understand that Mr. Dewitt, you know, never had a birth

23   certificate, a social security card, or --

24           MR. GUILLAUME:  That's the problem, Your Honor.  So

25   even if -- from the day I met him -- and I think Mr. Butler can

```
 1   attest to this -- there's been an -- we had -- there's been an
 2   undercurrent of trying to get his identification.  Even the
 3   government has been made aware of this potential problem of
 4   trying to verify certain facts, that are not really relevant to
 5   the case, but just for purposes of his being, I guess; that's
 6   the word I'll use.  As far as a birth certificate or a social
 7   security card, things that as -- we've had a lot of hurdles in
 8   that respect while this case was going on, and --
 9             THE COURT:  Can I ask a question in that regard.
10   Since Mr. Dewitt has had two prior felony cases in federal
11   court, what did the prior PSR note as his date of birth; do we
12   know?
13             MR. IZANT:  Your Honor, I believe he used a false
14   identity.  He was convicted, and he proceeded to --
15             THE COURT:  I just want to know what the PSR said was
16   his date of birth.
17             MR. IZANT:  The PSR used the defendant's false
18   identity.
19             THE COURT:  How do you know that?  I -- frankly, I
20   look to Probation because they usually verify the information,
21   one way or another, and then double-check it when it comes to
22   this Court from another PSR.
23             THE PROBATION OFFICER:  Yes, Your Honor.  So I have --
24   I'm sorry.  I have both of the PSRs.  One of them lists his date
25   of birth as August 28th, 1948, and his name is Brice Fletcher.
```

```
 1              THE COURT:  Okay.  That's for one of them.
 2              THE PROBATION OFFICER:  Brice, B-R-I-C-E.
 3              THE COURT:  Okay.
 4              THE PROBATION OFFICER:  Oh, actually, they did a
 5   combined PSR for both cases, so there's just one PSR, and it
 6   lists 8/28/48.
 7              THE COURT:  Do -- yeah, the government contends that
 8   this is false, that it's a fake ID, and the date is false.
 9              Do you have any -- have you all discussed that, do you
10   have any corroboration of that from Probation?
11              THE PROBATION OFFICER:  I don't, Your Honor.
12   Mr. Dewitt's rap sheet has a lot of names and dates of birth on
13   it.  The date of birth I put on the report is the one he told me
14   was his date of birth when I interviewed him.
15              THE COURT:  Okay.
16              THE PROBATION OFFICER:  But I wasn't able to get
17   any --
18              THE COURT:  So the September 15, 1950 came from
19   Mr. Dewitt, the one on the face sheet, page 3?
20              THE PROBATION OFFICER:  Correct.
21              THE COURT:  Okay.  All right.
22              Mr. Izant, what do you have for me as to the falsity
23   of the prior date of birth?
24              MR. IZANT:  Well, Your Honor, my position would be
25   that it can't be both.
```

1          THE COURT:  Well, I agree with that.

2          MR. IZANT:  And so it has to be one or other, and the

3   defendant is identifying himself as Valfonso Dewitt, and so we

4   submit that that's the correct one.  As to whether August 28th,

5   '48, versus September 15th, 1950, we don't have a position,

6   Your Honor.

7          THE COURT:  Okay.  All right.

8          Mr. Guillaume.

9          MR. GUILLAUME:  Thank you, Your Honor.  I just --

10  I think -- well, I'll just submit on what I've just been told.

11  I was present for the PSR interview.  I admittedly did not pay

12  too much attention to the date of birth section, but either way,

13  the -- I don't want to get bogged down on that issue --

14         THE COURT:  Yes.

15         MR. GUILLAUME:  -- he's still in his 70s, 72 or 74,

16  and a ten-year sentence, it's -- even with time served has him

17  in his early-to-mid-80s when he's released from the

18  Bureau of Prisons.  As Your Honor just noted, as we noted in our

19  report as well, the life expectancy, the quality of life,

20  of course, reduces significantly when a person of that age or

21  any person is incarcerated for a long period of time, especially

22  for someone of that age.

23         He's in relatively good health, Your Honor, but he's

24  still a 70-plus-year-old man, African-American man, and his -- I

25  say his race intentionally because the mortality rate,

1    unfortunately, for African-American men is different than other

2    groups.

3            Your Honor, he -- as far as acceptance is concerned,

4    just to address the government's point, I don't really take a

5    position other than to say, Mr. Dewitt -- I know the Court will

6    not hold it against him for going to trial, but he's -- I want

7    him to hear me say this as well.  He's availed himself of the

8    opportunities that this -- the Constitution has given him.  He's

9    exercised his right to a jury trial.  He was found guilty.

10           He plans to appeal, so he's very conscious of -- of

11   that, of that fact.  The appeals -- the appellate process will

12   play itself out how it plays itself out, and I don't -- and

13   again, I don't want to -- I know this Court will not hold it

14   against him, but I just want say, the fact that he doesn't say,

15   "I accept responsibility," or something to that effect, it's

16   because of the appellate issues that he believes are involved.

17           THE COURT:  It's -- sure, right.  And I guess,

18   Mr. Guillaume, just to put a finer point on it, are you asking

19   me to have -- to take a position, in other words, disagree with

20   the policy of lack of acceptance anytime a person elects to go

21   to trial?

22           MR. GUILLAUME:  I'm not so -- I know this Court well,

23   Your Honor, and I don't -- I know you won't -- you're going to

24   judge him how you judge him, based on a variety of factors, but

25   to -- if the government raised it the only reason that I'm

1    raising it.

2              THE COURT:   Mm-hmm.

3              MR. GUILLAUME:   I guess, I -- if the Court would like

4    to make its thoughts known on that issue, I suppose, but -- I'm

5    not asking for it necessarily, but I'm not going to object if

6    you do, Your Honor.   I just think that all the other things we

7    have in play here -- and age is a huge factor in this case.

8              What was proven at trial was proven to be a very

9    dangerous substance, a substance that is a scourge on society,

10   but again, as the Court points out, I think some of the times

11   and -- as a defense counsel in these cases, it's very

12   frustrating for me.   I mean, the laws exist for a good reason,

13   but some of these drug laws, especially with the fentanyl now,

14   clients don't necessarily understand the ramifications.   Some

15   do, some don't.   I'm not going say everybody doesn't understand

16   it.   I'm not going to say that he doesn't -- and I'm just

17   speaking more generally now, I guess, of how dangerous the

18   particular drug -- I mean, the fact -- I'll speak to the facts

19   at trial.

20             The fact that Mr. Gatson transported this substance in

21   his car the way he did and handled it the way did kind of shows,

22   I think, the lack of sophistication of the overall conspiracy

23   and how -- we know how deadly the drug can be just upon touch.

24   The fact that he -- there didn't seem to be a concern about that

25   speaks to the unsophisticated nature of this conspiracy.

1          Unfortunately, I think that that drug or that --

2    whatever it is was the method of making money, and here we are.

3    In spite of its broader horrific effects on society -- and I'm

4    not --that doesn't -- trust me, Your Honor, this doesn't -- I'm

5    not trying to make excuses for him at all in that respect, but I

6    just -- I think it's an important factor for me to mention as

7    far as the level of sophistication of this conspiracy that was

8    proven at trial.

9          Mr. Dewitt, Your Honor, he and I have had a very

10   interesting -- and I say that in a good way -- experience, since

11   I -- since from the -- I don't remember some of the -- from my

12   initial start to where we are now.  And Mr. Mebane is in court

13   and I want to recognize as well has also been pivotal in helping

14   me relate to Mr. Dewitt and do things for Mr. Dewitt.  And in

15   spite of what is on paper, Mr. Dewitt is a good man and

16   unfortunately is going to have to serve a lengthy prison

17   sentence.

18         My hope is that he will be released while he's still

19   alive and stays in touch with me, and I'm scared for what's to

20   come, because whether it's 135 months or 120 months, he's going

21   to be an old man with very little left out in the world for him,

22   very little time and friends.  And whatever the Court can do to

23   help save his life, I would greatly appreciate it, because it --

24   we all -- it is what it is, but I don't want -- this sounds a

25   bit -- little inarticulate, but I just -- that's just me being

1    blunt, Your Honor.

2            So the biggest factor from my perspective, as I stand

3    here, is his age, is his health, is his race, all those things

4    that -- that I usually don't talk about in these cases but I'm

5    being very intentional about saying now.  And the guidelines are

6    what they are, but the previous conviction date, even if it was

7    2000, it was 23 years ago, if it was in 1989, whatever it was,

8    it was a long time ago, and he served a big sentence as a result

9    of that conduct.

10           My client is not the most sophisticated man in the

11   world, he's not the most educated man in the world, but the fact

12   that he's still here speaks volumes because of the way he's been

13   able to maneuver in the world.  And it's not always through

14   illegal activity.

15           This unfortunately happened, unfortunately for lots of

16   different people, for society, for him, for potential victims,

17   but we're just -- we understand the guidelines, we don't have

18   any substantive objections, but we are asking for a variant

19   sentence for the reasons that I have articulated, in spite of

20   what my client may say behind me.  I don't know what he's going

21   to say, if he says anything at all, but he's -- some of the

22   motions that have been filed and things of that nature.  He is a

23   man of a certain generation, and that's also an important factor

24   that I think I should be -- say as well, that believes what he

25   believes, and I am a man of a different generation, so he's old

1    enough to be my grandfather, just barely.

2          So I think the Court should -- and I know Your Honor's

3    fair and will take that into consideration, but in any event, we

4    are asking for the low end -- excuse me, not asking for the low

5    end, asking for a variant sentence of 120 months.  And my client

6    intends to file an appeal, and as I said earlier, the appellate

7    process will play itself out, so you won't probably hear him say

8    certain things if he does -- if he decides to speak, but in

9    spite of that, I still would ask for the 120-month sentence,

10   Your Honor.

11         Thank you.

12         THE COURT:  All right, thank you.

13         Mr. Mebane, thank you for a well done mitigation

14   report; I really appreciate it.  And when you have a minute, I

15   would very much appreciate the citation to the study that you

16   referenced with respect to shortened life expectancy.  I noted

17   that you provided me the -- the citation to the National Center

18   for Health Statistics regarding the shortened life expectancy of

19   African-American males.  The other one -- I've seen that one.

20   The other one I know is more recent.  I'd like to read it in

21   sort of real-time.

22         MR. MEBANE:  (Nodding.)

23         THE COURT:  Thank you.

24         Okay.  Mr. Dewitt, it's now your opportunity if

25   there's anything you wish to say before I impose sentence.  You

1    don't have to speak, you have the absolute constitutional right

2    to remain silent, and I will not hold your silence against you,

3    but if there is anything that you wish to say before I impose

4    sentence, now would be the time.

5              THE DEFENDANT:  Yes, I would like to say something.

6              THE COURT:  And actually, you can sit, it's really

7    fine, as long as you pull that microphone close to you.

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  Okay, there you go.

10             THE DEFENDANT:  Thank you very much.  I would like to

11   reflect some of what -- Mr. Izant's statement in reference to

12   why I'm here.  And I never exercised any dominion, control of --

13   dominion, control, or constructive possession of no contraband,

14   period.  He never found none in my possession, at no given time,

15   or in my home, place, or property.  Also, Mr. Izant has stated

16   that I've navigated and was a leader in instruction, you

17   understand, a sale or a buy, and he had me up under

18   surveillance, but nevertheless, I wasn't in commission of no

19   crime.  And based upon my First Amendment right, I have a right

20   to converse with James Gatson in society.  He didn't consider

21   those factors.

22             Also, you know, during the course of this whole

23   investigation and Judge -- Mr. Day, Judge Day, I think his name

24   is, has stated that a time frame in my speedy trial.  It was

25   brought to the table, you know what I'm saying, to my attorney,

1    you know, and I was trying to point that out to them, and they

2    got their dates wrong and conflicted, that I came into their

3    custody on the 26th of August.  I came in the custody of the

4    Marshal June 17, 2021.  Mr. -- the Judge, A-J-M-E-L, Quereshi

5    has stated that there's a time -- it was a time gap in between

6    of me being in his courtroom, and he questioned that in

7    reference, you understand, in giving me home confinement.

8              THE COURT:  So you're saying that you came in not in

9    July but in June?

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURT:  And that -- so you should get credit for

12   that time?

13             THE DEFENDANT:  Yeah, not only get credit for it, the

14   case should have been dismissed by a speedy trial, you know, and

15   not only that, like I said, I didn't have dominion -- I didn't

16   exercise dominion, control, or constructive possession of no

17   contraband, period.  I had made the statement at my beginning of

18   my appearance when I got here, when I got here in Maryland, in

19   the District Court, in front of Judge Day, and I quoted that,

20   and he said that that wasn't the right -- that wasn't -- I

21   wasn't in the right court, you understand, to make that

22   statement.

23             THE COURT:  To make that argument, yep.

24             THE DEFENDANT:  So he saw me -- so he told them to be

25   ready for trial in September.  Yet instead, I didn't come to

25

1    trial until 2023.  So I brought it to my counsel attention that,

2    you know, we have a speedy trial.  Everyone kept on trying get

3    me to go to court to get released of my home confinement, rather

4    than me being released in my own recognizance, or have the case

5    dismissed, you know what I'm saying, through my pretrial

6    proceeding.

7             I know I filed motions pertaining, you understand, to

8    the fact that I'm innocent, because I never seen any drugs,

9    never had possession of drugs, and the fact of the matter, that

10   during the affidavits, you know what I'm saying, the arrest

11   warrant, they all together saying my conversations have been,

12   you know, in that -- in the report.

13            You can hear me now?  The arrest warrant, what they

14   did was, I said five hours or ten hours, whatever the case, like

15   I don't have it in front of me, but they expounded with their

16   assumption and opinions, saying that it meant thousands of

17   dollars of what had happened.  So when a friend of mine helped

18   me structuralize my letters or my motion to file in court, we --

19   I pointed out those factors to him, and like I say, you know, my

20   motion was sealed by Judge Gina Simms, you know, even though the

21   motion that I filed, you know, to get them to change counsel,

22   get rid of Mr. Guillaume, where those motions was sealed.

23            But yet, Mr. Gatson still came to trial with the

24   gentleman here that would have him support fact as a friend or

25   attorney, because when they released me, I was on home

1   detention, I didn't have no money.  They released me to a

2   halfway house shelter that I couldn't pay the rent, and him and

3   Mr. Turner was able to pay the rent for me.  You know, I didn't

4   have a job.  I got on welfare to try to survive in a town that I

5   have no knowledge of, for five months.

6          THE COURT:  Right, I looked at that.  So from

7   October 4, 2022, until trial --

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  -- you were out on release, and you were

10  just -- you're just letting me know that Mr. Guillaume and

11  Mr. Mebane helped you during that time, because you were in a

12  strange place, with no ties to this area.  Am I getting that

13  right?

14         THE DEFENDANT:  Yeah.  Yeah, in fact, in the homeless

15  shelter, you understand, you know, like I said, he gave me --

16  gave me some assistance, and the lady that I was staying with,

17  you know, they sheltered me, you understand, you know, I'm in

18  debt with them, you understand, for rent that I owe them for

19  four months.

20         But anyway, nevertheless, you know, I want to make

21  that part of the record, you understand, and whatever, you

22  understand, you know, that I have to face here today, you know,

23  I have to accept that and try to do my appeal.  But you

24  understand, I want to state for the record that I'm innocent of

25  all the charges, because like I said, I've never exercised any

27

1    due diligence, like I said, dominion, control, or constructive

2    possession, you understand, at no given time, in the commission

3    of no crime.

4            And the fact that he brought Gatson -- yeah, I think

5    his name is Gatson, that is a charge that's dismissed over here

6    in state court.  I have a speedy trial -- at least -- not a

7    speedy -- not only on the speedy trial violation, I also have

8    double jeopardy by res judicata, you know, and I want to make

9    that part of the record, because if I don't put these on the

10   record along with my attorney, Mr. Guillaume, had already put on

11   the record and the motion we filed, then there's no way I can

12   come back and appeal these issues.

13           So I want to state that for the part of the record

14   because I wanted to state during my earlier trial, you know what

15   I'm saying, because it was validated, you understand, to why I'm

16   here.  And like I say, everyone ignored that, but Judge -- I

17   don't know how to pronounce his name --

18           THE COURT:  -- Quereshi?

19           THE DEFENDANT:  -- Quereshi -- Quereshi, that's him.

20           THE COURT:  Who released you?

21           THE DEFENDANT:  He released me, but before he released

22   me, they brought the subject to the table regarding my release

23   in my own recognizance.  He stated to him, he said, you know, we

24   have a gap, a time frame gap here.  I didn't know he was

25   speaking about the time frame, you understand, in the

1  wiretapping, which the wiretapping that they tapped wasn't --

2  the phone wasn't in my name, so the wiretap itself was illegal,

3  because like I said, I never got served with it.  And they just

4  kidnapped me out of Georgia out of thin air and took 45 days or

5  40-some days to bring me, you know what I'm saying, to Maryland.

6          THE COURT:  So you were arrested in Georgia?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  Okay.  Let me just confirm that I have the

9  dates right on that.  I don't mean to interrupt you, but you're

10 entitled to credit for the time that you were arrested and

11 brought --

12         THE DEFENDANT:  Right.

13         THE COURT:  -- so I want to make sure I have it right.

14 Ms. Dasovic?

15         THE PROBATION OFFICER:  Yes, Your Honor.  So as the

16 defendant was speaking, I was looking it up, and I did make a

17 mistake on the release status.

18         THE COURT:  Okay.

19         THE PROBATION OFFICER:  It looks like he had his

20 initial appearance in Georgia on June 18th, 2021, and his rap

21 sheet shows the arrest on June 17th, the day before.

22         THE COURT:  So arrested and in custody --

23         THE PROBATION OFFICER:  June 17th.

24         THE COURT:  And so should -- and was he in federal

25 custody at that time?

1    THE PROBATION OFFICER:  Yeah, so he was detained in

2  Georgia pending removal to Maryland.

3    THE COURT:  Okay.

4    THE PROBATION OFFICER:  So that was federal.

5    THE COURT:  So then the face sheet of the presentence

6  report will be corrected --

7    THE PROBATION OFFICER:  Yes.

8    THE COURT:  -- to show he was in Marshal custody from

9  June 17, 2021.

10    THE PROBATION OFFICER:  Correct.

11    THE COURT:  Okay, great.

12    All right.  Mr. Dewitt, we're going to make that

13  correction, because it's credit that you'll get for that time.

14    THE DEFENDANT:  Thank you very much.

15    THE COURT:  All right.

16    THE DEFENDANT:  And not least but last -- oh, it's

17  slipping my mind, um ...

18    (Conference between Mr. Guillaume and the defendant.)

19    MR. GUILLAUME:  Your Honor, while he's thinking, I

20  wanted to just make a point that I forgot to make; I apologize.

21  Your Honor, the conspiracy is alleged to have ended, I believe,

22  in 2019, if that's not -- if that's correct.

23    MR. IZANT:  (Nodding.)

24    MR. GUILLAUME:  Mr. Dewitt was arrested in, as we just

25  heard, 2021.  I don't know of any criminal activity that

```
 1    occurred between the time that he was arrested, for what it's
 2    worth.
 3              THE COURT:  Right, there's nothing that suggests
 4    Mr. Dewitt was --
 5              MR. GUILLAUME:  He was -- I think once Mr. Gatson got
 6    arrested, I think it shut everything down.  So that's my reading
 7    of it, Your Honor.
 8              THE COURT:  Okay.
 9              MR. GUILLAUME:  Thank you.
10              THE COURT:  All right, thank you.
11              THE DEFENDANT:  But anyway, Ms. -- Judge Xinis, that's
12    all I can -- oh, yeah, I know what I meant to say.  The reason I
13    didn't -- they didn't get all the evidence in that report, I
14    didn't put them in there, you know; I got arrested because how
15    could I put something that I can't read, even hard to pronounce
16    when they wrote it up in there?  So what was brought to my
17    attention before, where I was trying to get my ID in Chicago,
18    that my parents had their own sovereignty.  So when I -- so --
19    you can hear me?
20              THE COURT:  Yes.
21              THE DEFENDANT:  Yeah, they had their own sovereignty,
22    right, so -- and I'm like, you know, why I didn't have a birth
23    certificate and social security number?  So I never had one,
24    even when I was in the feds, you know what I'm saying, they
25    scrapped me to try to get a number, and we still were stuck.
```

1              So they released me back into society, you know what
2       I'm saying, I think around '98.  I was still struggling, trying
3       to get a social security number and a birth certificate, and
4       like I said, no -- like I said, I still was empty.  So when they
5       arrested me, on a charge out of New York -- oh, let me go back.
6       No, they picked me up on the charge out of D.C., and they got it
7       dismissed, and the statute of limitation on the charge that they
8       charged me with in New York that gave me the 15 years, which
9       they -- which I got hit five -- nine times at my initial boards.
10      They -- I did all their programs, and they still, you know, hit
11      me at the board, two years, two years, 15 months, 30 days.

12              And the reason why they hit me many times, the
13      prosecutor that prosecuted me on the charge that did it, did the
14      indictment, which was defective, because he got arrested, you
15      understand, for taking works off the street and putting them
16      back on, him and my attorney out of Auburn, New York.  I had
17      brought that to my attorney and Mr. Turner attention.  And he
18      say he couldn't find it, but in that -- in their report, if you
19      look at that indictment, that prosecutor went to jail, and I
20      shouldn't have went to jail.  He got arrested in '89, when the
21      case took place, because I only was charged for reckless
22      driving, constructive administration of property.  And we was
23      released.

24              They hunted me down for another 13 years on that
25      charge, saying that I had an outstanding warrant in New York,

```
1   but I was in your federal system, you understand, for like five

2   years, you know what I'm saying.  No warrants and nothing else

3   came up or came about.  So somehow, for some apparent reason,

4   they got a hit or something, someone told them that I was in --

5   I was in Ohio, and I got -- I went to court, and they brought me

6   to New York, and I'm like why I'm in New York?

7           And like I say, they found me -- they coerced me and

8   undermined me to plead guilty to a charge that a former alleged

9   said that he found a suitcase off the riverbank on his property,

10  and this alleged supposed to have drugs and a gun in it, and

11  they said it was mine, with no DNA evidence.  So they give my

12  codefendant 25, they found him guilty of 25 years.

13          And the judge said something -- said, Mr. Dewitt,

14  said, how could they put you with a suitcase they don't have no

15  DNA on you?  I said, Don't have no DNA because I've never seen

16  the suitcase before.

17          So anyway, I got -- he asked me to plead guilty to

18  three years for the suitcase that allegedly supposed to have

19  paraphernalia, and drugs, and guns in it, but don't know the

20  amount it was and asked me to plead for the two years in the

21  federal court, you understand, to run with the five years, and

22  they'll dismiss the charges in the fed.  That's how I ended up

23  with the five years to life in New York State, and I should have

24  been home in two years, but they hit me in my initial board.

25              THE COURT:  Your parole board, is that what you're
```

1    saying?

2              THE DEFENDANT:  What you call presumption release

3    board.

4              THE COURT:  Okay.

5              THE DEFENDANT:  They had that and gave me two -- 24

6    months.  And my initial board came about in the five years, they

7    hit me with another 24 months.  Then I came back, you know what

8    I'm saying, and they hit my with another 24 months, and then,

9    after that 15 months, a year, then nine months.  Then I'm like,

10   Nah, I ain't even going to the board no more.  So they had --

11   came -- coming back and said, Go to your board.  The warden that

12   was at the facility at Franklin said, Go to your board,

13   Mr. Dewitt.

14             I said, I ain't going to no board; just send the

15   paper.  I'm just going to sit here for the rest of my life,

16   because they didn't resentence me up behind the Rockefeller law,

17   which had passed in two thousand- -- at least 2004, so they

18   didn't resentence me and honored that upon the statute, and I

19   stayed in jail until 2014.  That's how that went in New York.

20   They be getting some clarity on Mr. Guillaume's statement.  That

21   give some clarity, you understand, on Mr. Izant.  That's what

22   happened.

23             And like I said, when I found out that the officer got

24   arrested, pertaining to that defective indictment, I found out

25   that ten years, while I was in New York State penitentiary by an

1    individual that was from Auburn, and they said, Yo, they said,

2    Mr. Dewitt, I know your case, you know what I'm saying, on

3    high-speed chase, that the prosecutors on your case that filed

4    that defective indictment got arrested, him and the lawyer that

5    represent you, you understand, for drug charges and guns, and

6    they were taking the drugs and putting them back on the street.

7           So I did another appeal.  The appeal just got shot

8    down.  Then the police throwed me in the 200 chute for three

9    years, you understand, and discard all of my legal work.

10          THE COURT:  And what is -- they threw you in the what?

11          THE DEFENDANT:  I did three years in the 200 chute.

12          THE COURT:  What's that?

13          THE DEFENDANT:  That's a maximum box.

14          THE COURT:  Like --

15          THE DEFENDANT:  Segregation.

16          THE COURT:  Segregation?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Two years?

19          THE DEFENDANT:  Yeah, I did three years in it.

20          THE COURT:  Three years?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  During the New York case?

23          THE DEFENDANT:  During the New York case.  They

24    threatened my life up there, you understand, because I was

25    writing them up, and I refused to take any of their programs.

1           THE COURT:  Mm-hmm.

2           THE DEFENDANT:  You hear me?  And like I said, they

3   was doing a lot of hideous crime to other inmates up in New York

4   State, because you have a blind box with no camera up in it, so

5   they would beat them to death.  You know, I got an assault

6   charge up there, where they jumped on me, and I had to go to the

7   hospital, you know.  So a lot things took place in New York

8   State penitentiary during that 15-year span when I was

9   incarcerated up there.

10          And also, you understand, the discrepancy with my date

11  of birth, which -- 1948 and 1950.  So like I said, they turned

12  around and put 1950.  It brought me back down, because they

13  had -- I had an ID that stated 1948.  They turned around and

14  changed it, you know what I'm saying, to 1950 and send me out,

15  you know what I'm saying, September 15, 1950, with that date of

16  birth, and I was able to get no benefits when I got to New York.

17  You hear me?  So when I went to Illinois to get my birth

18  certificate, try to get the birth certificate, I had my

19  godmother to sign for -- to sign, you understand, the delayed

20  record of birth.

21          While I was in your custody -- when I was in your

22  custody, she passed, in two thousand- -- 2021, of -- Thanks- --

23  the day after Thanksgiving.  And she lived to be 99 years old.

24  You know what I'm saying?  So like I said, so I'm stuck.

25          So I think this young lady here tells me through

1   someone out in the street at one of the shelter residence -- I

2   think it's St. Francis -- you know, trying to get my ID, so I

3   gave them all of the information and tried to get it -- you

4   know, so I can get my social security disability benefit.  I

5   wasn't able to succeed with that.  So every time I went to the

6   Social Security place, I ain't got no ID, they won't give me no

7   social security card number, so I'm stuck.

8          So like I said, I come out of here tomorrow because

9   you -- that's a hypothetic -- you release me tomorrow, I'm still

10  in the same pickle.

11         THE COURT:  Right.

12         THE DEFENDANT:  I came -- I'm like a walking dead, and

13  it don't -- no matter which way I go, if I don't get no ID,

14  period.  You know, so anyway, I wanted just to clear that, you

15  understand, and make that part of the record, you understand,

16  because you needed some clarity on what happened in New York.

17  Well, I'm here.  I can tell you what happened in New York, you

18  hear me, I'm saying -- like I said, it was a fish hunt, you

19  understand, because I didn't have no works in the car.  Then

20  they confiscated the car, and they give it back to me.

21         You gotta show -- I got stuck all around the board

22  when I went -- when Marco (phonetic), you understand, we was

23  doing -- we was doing some music production, promotion, coming

24  out of Massachusetts.

25         So the car that I had, had purchased, was paid for,

1    but it had a tag in the left-hand window, and the officer pulled

2    us over -- pulled us over, said we were speeding.  We wasn't

3    speeding.  It was a robbery, it was a robbery, and to -- I

4    acknowledged him, like, Oh, he's trying rob us.  And I stepped

5    off on him, and we got a high-speed chase.  They kept me in jail

6    up there for 21 days, and on a million dollars bail for a

7    traffic violation.

8            You've got to show all the records that you all trying

9    to find.  They cover them and sealed them, because they didn't

10   want to expose that prosecutor.  His name is Dennis something.

11   But you know, like I said, is, you know, if you look at it, I

12   can't -- couldn't quite recognize his name, but it's Saul or

13   something like that.  But that guy went to jail and did time,

14   you know, from -- I confront him and the lawyer in the State of

15   New York, Auburn, and Judge -- not -- Mr. Judge Peter Corning

16   has stated that I shouldn't be in the jail, and so he preserved

17   all my constitutional rights to appeal.

18           So I -- and like I said, after ten years, I realized

19   they weren't going to honor my appeal, because it -- the

20   prosecutor would get prosecuted, and everyone that he arrested

21   would be out of jail.

22           THE COURT:  So Mr. Dewitt, I think I have a good

23   picture of that.

24           THE DEFENDANT:  You got it?

25           THE COURT:  Is there anything else as to this case

1   that you want tell me about?

2          THE DEFENDANT:  That's it.  No, that's it.  I'm done

3   now.

4          THE COURT:  All right.

5          THE DEFENDANT:  Thank you very much for your time and

6   your patience, allowing me to speak.

7          THE COURT:  Of course, all right.

8       (Conference at the Bench.)

9       It is the policy of this Court that every guilty plea and

10  sentencing proceeding include a bench conference concerning

11  whether the defendant is or is not cooperating.

12      (Open court.)

13         THE COURT:  All right.  Anything else before I

14  announce the sentence?

15         MR. GUILLAUME:  No, Your Honor.

16         THE COURT:  All right.  Mr. Dewitt, as know -- you

17  don't have to stand.  It's okay, you can sit.  Unless you want

18  to, but you don't need to, okay?

19         You have one of the most -- how can I put this --

20  stunning life stories, and I'm going to start with that factor

21  in the 3553(a) factors.  I'll get -- we talk a lot about the

22  guidelines.  I'll get there, but I have to consider each factor.

23  And starting with you, you're 72 years old, and according to

24  everything I know about you, you've been a bit of a rolling

25  stone.  You know, your parents left you very, very early in your

1    life.  No real papers to even enroll in school, no one who took

2    care of you the way that parents do.  You had to provide for

3    yourself.

4         I'm going to put on the record some private stuff, but

5    it's important for the Court above me to know why I am imposing

6    the sentence I am imposing, that you battled drug addictions

7    since you were in grade school.  I mean, young, little, 12 years

8    old.  To be using hard drugs like heroin is -- I don't,

9    fortunately, see that very often.  And yet, you've always found

10   a way to survive.  Sometimes legal, sometimes not legal.  But

11   you've always found a way through.

12        To your credit, while the government, you know,

13   discusses your history with regard to drug distribution and

14   dealing, and you've admitted to as much today, to your credit,

15   you don't appear to be a guy like up to his eyeballs in

16   violence, in firearms.  At least, you know, there's no

17   convictions that suggest -- you have a very old assault, but no

18   convictions that suggest that was your -- the way you ran.

19        I listened to the evidence at trial, and you know, to

20   some degree, I do agree with the government that you were

21   chasing this very, very, very dangerous drug.  But I also sat

22   through the sentencing of your codefendant, and your

23   codefendant, Mr. Gatson, you know, convinced me, at least, that

24   it wasn't until after this all was over and you all were

25   arrested that he realized just how dangerous what he was

1    trafficking in was.

2           And your counsel makes a good point; your conduct is

3    consistent with that.  The way that he was handling the drugs,

4    the way you were handling it, the phone calls, it was all about

5    getting paid, but it really was with no reflection on how

6    dangerous the drug was.

7           Whether you're 72 or 74, the mandatory minimum is

8    going to hit you hard, because you will be in prison for a

9    decade, or close to it.  That's a stiff sentence at your age,

10   and I do credit that age matters, it does, and it matters the

11   older you get and the longer your confinement is.  It is a

12   factor that I am permitted to consider, and I do, along with

13   your remarkably difficult history.

14          Now, on the other side, this is an incredibly serious

15   case.  The government said it in opening, they said it during

16   the trial, and they said it in their papers, that 250,000 doses

17   of fentanyl is what you were actually trafficking in.  And I

18   know you maintain your innocence, but the jury has spoken on

19   this, and so at least with regard to that, that is among the

20   most serious of drug offenses.

21          Now, you exercised your right to trial in that regard,

22   and the evidence bore out the jury's verdict, it's a rational

23   verdict.  And I have to certainly take into account how serious

24   that is, and I think Congress has spoken to how serious that is;

25   it's a mandatory 10-year sentence.  So in that, I think, the

1    government is square on when they ask for the low-end sentence.

2         Now, the last piece that I want to address is the

3    guidelines.  We talked a little bit about it.  I do believe that

4    the guidelines -- I think it's noteworthy that your guidelines

5    are an offense level 32 and a criminal history category II,

6    which puts you at a 135 to 168 range.  Had you simply pled to

7    the indictment, two levels off would have put you below the

8    mandatory minimum.  I understand that there is a -- the

9    guidelines -- it tries to build an incentive for individuals to

10   admit responsibility and to plead guilty so that they get a

11   reduction.

12        While I don't believe I have to say I disagree with

13   that policy, in your case, I think it's somewhat overly

14   punitive.  You went to trial.  It was a split verdict.  Some

15   were not guilty, some were guilty.  You had something to say.

16        This was not, as a former colleague would say to me, a

17   slow guilty plea.  You exercised your constitutional right, and

18   the jury didn't go your way on all counts, but it's noteworthy

19   to me that for the -- because you made the decision to do that,

20   the guidelines build in a 27-month difference.  It's a big

21   difference.  And I take that into account, and I find it to be

22   overly punitive simply because you exercised your right to

23   trial.

24        When I look at all of those things, all of the

25   mitigation, all of the aggravation in this case, it's my view

1    that the sufficient but not greater than necessary sentence is

2    121 months.  I know that might sound like counting angels on the

3    head of a pin, but the reason is to acknowledge that the

4    mandatory minimum is supposed to be set aside for, in Congress's

5    view, the least culpable, the least of the -- the bottom of the

6    bottom for anyone trafficking in these narcotics.

7              In your case, there were some aggravating factors;

8    we've discussed them.  In addition -- I haven't mentioned it

9    yet, but I think it's warranted to mention it now -- there was

10   evidence that once arrested, you tried to encourage Mr. Gatson

11   to stay strong, not, perhaps, take the road that he took.

12   There's some indication that that, in and of itself, is an

13   aggravator, in my view.

14             But overall, a 120-month sentence, for you, at your

15   age, with your limitations is going to be a real lift.  It will

16   be followed by five years of supervised release, and I'll

17   announce this more formally.

18             Before I get to the supervised release, Mr. Guillaume,

19   did you review the mandatory and standard conditions of

20   supervision with Mr. Dewitt?

21             MR. GUILLAUME:  Your Honor, I did not have the

22   opportunity.  Maybe if I can look back and see if Mr. Turner had

23   a chance to do that with him, or --

24             THE COURT:  If not, then I'll review them.

25             MR. GUILLAUME:  I don't think -- just for purposes of

1    the record, we need to do it now.

2           THE COURT:  Okay.  We'll do that, then.

3           So this will be the sentence for the reasons we've

4    already discussed, Mr. Dewitt.  Count One is 121 months, custody

5    of the Bureau of Prisons.  It will be followed by five years of

6    supervised release.  There will be no fine.  Count Seven will be

7    48 months concurrent with Count One.  Count Ten will be

8    48 months concurrent with Counts One and Seven.  For both Counts

9    Seven and Ten, it's one year of supervised release to run

10   concurrently with the five in Count One.  There will not be a

11   fine associated with any of the Counts.

12          Now, with respect to supervised release, as you may or

13   may not know, it's like probation.  There are standard and

14   mandatory conditions.  I'm going to go over the standard

15   conditions with you first.

16          (1) You must report to the Probation Office in the

17   federal district where you are authorized to reside within

18   72 hours after you're released from prison, unless the probation

19   officer instructs you to report to a different Probation Office

20   or within a different time frame.

21          After initially reporting to the Probation Office, you

22   will receive instructions from the Court or the Probation Office

23   about how and when you must report to probation.  You must

24   report as instructed.

25          (3) You must not knowingly leave the federal judicial

1    district where you are authorized to reside without first

2    getting permission from the Court or from Probation .

3            (4) You must answer truthfully the questions asked to

4    you by Probation -- your probation officer.

5            (5) you must live at a place approved by the probation

6    officer, and if you plan to change where you live or anything

7    about your living arrangements, you must let Probation know at

8    least ten days in advance of making the change.  If notifying

9    your probation officer is impossible, then, you must notify the

10   probation officer within 72 hours after becoming aware of a

11   change or expected change.

12           (6) You must allow probation to visit you at any time

13   at your home or elsewhere, and you must permit the probation

14   officer to take any items prohibited by the conditions of your

15   supervision that he or she observes in plain view.

16           (7) You must make every effort to work full time,

17   that's at least 30 hours a week, and if you don't have full-time

18   employment, you must continue to make good-faith efforts to find

19   work.  If you change your job, you have to let Probation know

20   within ten days, and if that's not possible, then you have to

21   notify your probation officer of the job change within 72 hours

22   after becoming aware of the change or expected change.

23           (8) You must not communicate or interact with someone

24   you know is engaged in criminal activity.  If you know someone

25   has been convicted of a felony, you must not knowingly

1    communicate or interact with that person without first getting

2    the permission of the probation officer.

3              (9) If you're arrested or questioned by law

4    enforcement, you must notify Probation within 72 hours.

5              (10) You must not own, possess, or have access to a

6    firearm, ammunition, destructive device, or dangerous weapon,

7    anything that is designed or to be modified for the specific

8    purpose of causing bodily injury or death to another person.

9              (11) You must not act or make any agreement with a law

10   enforcement agency to act as a confidential human source or

11   informant without first getting the permission of the Court.

12             (12) If Probation determines that you pose a risk to

13   another person, then Probation should notify the Court and ask

14   that -- for this Court to impose the specific condition that you

15   must notify the person about the risk.

16             Last, you must follow the instructions of the

17   probation officer related to the conditions of your supervision.

18   Those are the mandatory -- those are the standard conditions.

19   In addition, there are the following special conditions of

20   supervision.

21             I neglected to say, for each of the counts -- you have

22   three counts -- there is a $100 special assessment.  That's a

23   mandatory Court cost.  I'm not going to make you pay it while

24   you're in prison.  You will not be part of the financial

25   responsibility program, so it will be a condition of your

1    supervision to pay the $300.

2            Second, you have to submit to substance abuse testing

3    or treatment as deemed appropriate by Probation.

4            And those are the special conditions.

5            While you're incarcerated, Mr. Dewitt, I am going to

6    recommend that you be evaluated and receive the residential drug

7    abuse treatment program.  It appears as if you've never had at

8    least inpatient treatment.  It seems like you've had some

9    treatment while you've been incarcerated, but the residential

10   drug abuse treatment program, it's a year-long program.  If you

11   are admitted, you get preferential housing.  It comes toward the

12   end of your sentence, but it can come with lots of other

13   benefits.

14           I don't know if you'll qualify for any reduced time

15   upon successful completion.  That you can ask the Bureau of

16   Prisons when you get there, but in my view, it's one of the best

17   programs that BOP offers, so I will strongly recommend you

18   participate in it.

19           Have you spoken with your counsel about a specific

20   recommendation for designation or any kind of programming you

21   might want to do?

22           MR. GUILLAUME:  Court's brief indulgence.

23           THE COURT:  Sure.

24       (Conference between Mr. Guillaume and the defendant.)

25           MR. GUILLAUME:  Your Honor, Mr. Dewitt has relatives

 1  in Georgia, and I'm -- forgive me for not knowing the name of

 2  the appropriate facility, but I know that there is one in --

 3  it's -- maybe FCI Jessup, I know is there, but in --

 4          THE COURT:  Do you want to do this, Mr. Guillaume?  I

 5  can -- it's already 4:00.  I can hold off on issuing the

 6  judgment.  If you want to speak with Mr. Dewitt or get the exact

 7  recommendation that you wish for me to put in the judgment, I'm

 8  happy to do it.

 9          MR. GUILLAUME:  Thank you, thank you, I'll do that.

10  Should I contact Chambers with that information?

11          THE COURT:  Yeah, you could e-mail Chambers --

12          MR. GUILLAUME:  Okay.

13          THE COURT:  -- and cc the government.  I'll make sure

14  that we put the designation recommendation in the -- you know,

15  in the judgment.

16          I can't guarantee it, Mr. Dewitt.

17          MR. GUILLAUME:  Of course.

18          THE COURT:  It's going to be up the Bureau of Prisons.

19          If there is any specific programming, as well, any

20  vocational work that Mr. Dewitt wants to do, let me know, and

21  I'll put it in.

22          MR. GUILLAUME:  Thank you very much, Your Honor.

23          THE COURT:  Okay, all right.  So let me do this

24  as well, because I know that this case is going to be the

25  subject of an appeal, perhaps a cross-appeal, and I want to make

 1    sure that the record is clear with respect to the grounds for

 2    this sentence, because I am varying from the low end of the

 3    guidelines.

 4         I do believe that it is sufficient but not greater

 5    than necessary to impose a 121-month sentence.  This takes into

 6    account the nature and the circumstances of the offense in that

 7    this was an incredibly serious offense, and a lengthy sentence,

 8    as Congress has recognized, is important to protect the public

 9    and reflect the seriousness of this offense.  It also in that

10    regard provides, in my opinion, sufficient deterrence, both

11    general and specific, because, Mr. Dewitt, you will be pushing

12    80 years old when you are released.

13         It does take into account the sentencing guidelines

14    and I think appropriately recognizes that acceptance of

15    responsibility in this case was taken off the table because

16    Mr. Dewitt exercised his right to trial through counsel.  He

17    didn't waste the Court's time, he didn't waste the jury's time.

18    He had arguments, the jury was permitted to hear them.  That's

19    his constitutional right, and in my view, I don't believe that

20    the guideline 27-month increase would be wholly warranted.  So I

21    do take that into account.

22         With regard to the need to avoid unwarranted

23    disparity, I'll note that Mr. Gatson had a reduced role.  He

24    pled guilty to the entire amount.  He was offered and received a

25    C plea of 72 months, which is six years.  The four-year

1    disparity, I do believe, between the sentence I impose on you,

2    Mr. Dewitt, vis-à-vis Mr. Gatson's role, is an appropriate span.

3    It is sufficient but not greater than necessary to recognize

4    your differing roles and the fact that he did admit

5    responsibility, but it is not so wide as to represent

6    unwarranted disparity.  So I do take that into account.

7            I also, as we talked about, recognize that you have

8    had particular challenges in your life.  I have named them.  I

9    do recognize that your criminal history has an eye-popping

10   15 years for a 2-ounce guilty -- for a guilty plea to possession

11   of 2 ounces of narcotics.  The records don't really elucidate

12   why.  You have filled me in, in part, because of the way in

13   which the parole system seems like it had worked, and included

14   in that 15 years was three years in solitary confinement.  I'm

15   not here to decide whether any time in solitary was warranted,

16   but I do note that that is a heavy, heavy, heavy burden on any

17   human body to take.  That's without dispute in the medical and

18   penological community.

19           So when I look at all those things, I do find that

20   121 months is sufficient but not greater than necessary, to be

21   followed by the terms of supervised release we have discussed.

22           I don't believe there's any counts to dismiss, right?

23           MR. IZANT:  Unless the Court needs the government to

24   make a motion as to the counts on acquittal, no, Your Honor.

25           THE COURT:  And I don't think so.  I think the jury

1   spoke, and so they're not before -- thank you.

2          So Ms. Derro pointed out that there was an original

3   indictment that is still pending.  I would imagine the

4   government's dismissing that as to --

5          MR. IZANT:  Yes, Your Honor, as to this defendant.

6          THE COURT:  Okay.  So as to Mr. Dewitt, the original

7   indictment is dismissed.

8          Mr. Dewitt, as you already know, you have the absolute

9   right to appeal.  You have to note your appeal within 14 days,

10  so please speak with Mr. Guillaume about that immediately.  And

11  with that, I wish you the best of luck.

12         THE DEFENDANT:  Thank you very much.

13         THE COURT:  All right.

14         MR. GUILLAUME:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         MR. IZANT:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         THE COURTROOM DEPUTY:  All rise.  This Honorable Court

19  stands adjourned.

20      (The proceedings were adjourned at 4:01 p.m.)

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL REPORTER

2         I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                        Dated this 16th day of August, 2023.

10

11

12    _____/s/_____
      PATRICIA KLEPP, RMR
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25