1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2                  NORTHERN DIVISION

3

UNITED STATES OF AMERICA,        )
4          Plaintiff,            )
                                 )
5     v.                         )Criminal No. 8:21-cr-00308-PX
                                 )
6  VALFONSO DEWITT               )
             Defendant.          )
7  _____)
                                   Baltimore, Maryland
8                                  February 16, 2024
                                   11:07 a.m.
9

10         **THE ABOVE-ENTITLED MATTER CAME ON FOR**
           <u>**PRETRIAL CONFERENCE AND ARRAIGNMENT**</u>
11            **BEFORE THE HONORABLE PAULA XINIS**

12

13               <u>A P P E A R A N C E S</u>

14  <u>ON BEHALF OF THE PLAINTIFF:</u>

15      JEFFREY J. IZANT, ESQUIRE
        GEONARD F. BUTLER, II, ESQUIRE
16

17  <u>ON BEHALF OF THE DEFENDANT:</u>

        ALFRED GUILLAUME, III, ESQUIRE
18

<u>ALSO PRESENT:</u>
19      TFO FERNANDO JARAMILLO, DEA

20

21

22      (Computer-aided transcription of stenotype notes)

23               <u>Reported by:</u>
             Ronda J. Thomas, RMR, CRR
24           Federal Official Reporter
          101 W. Lombard Street, 4th Floor
25           Baltimore, Maryland 21201

```
1   (11:07 a.m.)
2           THE COURT:  Will the Government call the case.
3           MR. IZANT:  This is United States v. Valfonso Dewitt,
4   Criminal Case No. PX-21-0308.  On behalf of the United States
5   I'm Assistant U.S. Attorney Jeff Izant.  I'm joined at
6   counsel's table by AUSA Geonard Butler and DEA Task Force
7   Officer Fernando Jaramillo.
8           THE COURT:  Good morning.
9           MR. GUILLAUME:  Good morning, Your Honor.  We have
10  Mr. Valfonso Dewitt who is sitting to my left at the trial
11  table.
12          THE COURT:  Okay.  Good morning, gentlemen.  You can
13  have a seat.
14          THE DEFENDANT:  Good morning.
15          THE COURT:  You all can stay seated today unless you
16  want to use the podium.  The main focus is to keep your voices
17  up in the microphone and speak slowly and clearly for our
18  wonderful court reporter, and we'll get started.
19       So I'd like you to first address the pretrial motions and
20  then we'll talk about voir dire and jury selection.  Okay.
21       What I have on tap is ECF-88, 89 and 90 from the defense.
22  There is also ECF-35, which is the Government's Motion in
23  Limine to admit co-conspirator statements.  I see that one as
24  sort of, you know, overlapping with ECF-88, which is the Motion
25  to Exclude the recorded calls.
```

 1     I don't believe, Mr. Guillaume, you responded to ECF-85

 2   directly but you did file 88.

 3          **MR. GUILLAUME:**  Yes, Your Honor.

 4          **THE COURT:**  My thought was maybe I'd start with you

 5   directly since the landscape of the case has it changed a bit.

 6   Mr. Dewitt is the only defendant left, so I would imagine it's

 7   going to narrow the case somewhat but on co-conspirator

 8   statements, not necessarily.  We have to sort of talk about

 9   that.  We're going start with that.

10     But I thought I'd start with you, Mr. Guillaume, now that

11   you've seen the Government's motion, think about how it

12   intersects with yours, hear your argument, and then turn to the

13   Government.

14          **MR. GUILLAUME:**  Thank you, Your Honor.  Your Honor, my

15   argument is really kind of unchanged which is why I didn't

16   reply because I would just be repeating what I had in the prior

17   motion.  Just on a very basic level, just to give the Court --

18   for the purposes of the record more than anything -- I filed a

19   motion with respect to certain calls the Government intends to

20   play that were intercepted on this wiretap where alleged

21   co-conspirators are referring to an individual by the name of

22   Valentino or Val.

23     My concern, as I addressed in the motion, is that at trial

24   the Government will opine either through a witness or in

25   closing argument that that person is, in fact, my client,

```
 1  Mr. Dewitt.  I guess the legal basis for my request would be
 2  primarily grounded in Rule 403.
 3          THE COURT:  Or is it even more basic than that?  Is it
 4  a foundational identity question, like, unless you shore-up
 5  identity.
 6          MR. GUILLAUME:  Right.  I think that's a major part of
 7  it.
 8          THE COURT:  Okay.
 9          MR. GUILLAUME:  Thank you for kind of reorienting me.
10      Just from a basic factual standpoint, I guess, dealing
11  with what Your Honor just raised, there's going to be evidence
12  that's put forward in this case that my client met with
13  Mr. James Gaston, that he -- and the two men have known each
14  other for years, they're friends.  That they had an encounter
15  when Mr. Gaston traveled to New Jersey for a funeral.
16      My argument in the motion I raised is that nowhere in any
17  of the many, well, almost -- well, over 1,500 calls that were
18  there, did my client ever refer to himself as Valentino.  There
19  were times when people may have -- I think one or two times in
20  all of those calls someone said Val, but not Mr. Gaston.
21          THE COURT:  Right, but others who were caught on the
22  wire with TT3 which is your client's phone --
23          MR. GUILLAUME:  Correct.
24          THE COURT:  -- called him Val.
25          MR. GUILLAUME:  Correct.  But no Valentino.
```

1      So there's two different calls.  Really, the one call that

2  is of most concern to me is the one where Mr. Gaston talks with

3  another person, an unknown person, who says "I met with

4  Valentino yesterday."  Either the day after or the days after

5  he saw my client in New Jersey.

6      Our argument with that is the same, that we don't know

7  that that person that he's referring to is Valentino.  I

8  understand why the Government wants to make the argument, but

9  for the Government to simply say that that's an alias that he

10  uses I think is not accurate or fair to my client.  Because,

11  again, he doesn't refer to himself as Valentino, and no one

12  does to his face or otherwise that it's obvious that it's him.

13      The call that Mr. Gaston made was on his line, not calling

14  my client, and saying "Hey, Valentino," et cetera, et cetera.

15  If Mr. Gatson had said "I met with Valfonso yesterday," then of

16  course I wouldn't have much -- a leg to stand on.

17      But I just think that we don't know, and it's very

18  problematic to me that if the Government is allowed to argue,

19  because they're going to say this is a foundational part of

20  this case that they believe they saw money being exchanged --

21  I'm assuming, I don't want to guess their strategy -- but I

22  think it's pretty clear was payment for drugs on some level.

23      **THE COURT:**  When, in relation to the September stop of

24  Mr. Gatson, did the alleged money exchange happen?

25      **MR. GUILLAUME:**  The alleged money exchange occurs in

1   May of 2019.

2   　　　　THE COURT:  And that was in September.

3   　　　　MR. GUILLAUME:  This was in September.  That's when

4   Mr. Gatson was stopped.  So my concern is that Mr. Gaston's --

5   may or may not have been talking about Mr. Dewitt because he

6   was in New Jersey for -- and, of course, I can make these

7   arguments to a jury in closing myself, but I just think the

8   potential for confusion or prejudice to my client is great.

9   　　　　THE COURT:  But the Val doesn't get the Government

10  there?  The burden with regard to identity is foundational

11  limits.  It's not so onerous that it has to be a one-to-one

12  letter for letter.  And there's lots of circumstantial evidence

13  to suggest that that's who Mr. Gatson was talking about is the

14  person he met in the parking lot.  And then there's all these

15  other texts and calls surrounding that meeting where Mr. Dewitt

16  is referred to as Val.

17  　　I mean, are you saying those are not about Mr. Dewitt?

18  　　　　MR. GUILLAUME:  I'm saying Valentino and Val are

19  different.

20  　　　　THE COURT:  Well, they are, but let me ask you a

21  simple question.  Do you take issue with the Val being referred

22  to as Mr. Dewitt?

23  　　　　MR. GUILLAUME:  For purposes of my argument, yes, but

24  I will concede that it is more likely than not versus the other

25  argument that I'm making.

1       The Valentino argument is very specific, you know, he can

2  be Rudolph Valentino, he could be Valentino Armani, who knows.

3  The fact of the matter is, Mr. Gaston goes to a place, at a

4  funeral, where he's interacting with lots of different people,

5  presumably other family members.  The Government surveils this

6  one encounter and, although I'm not saying they can't talk

7  about it, all I'm saying is that for them to then argue that

8  Mr. Dewitt is Valentino, which is very different in my opinion

9  than Val, and that somehow that forms a piece of the puzzle for

10 them in the conspiracy because if the jury believes that

11 Valentino is Val -- excuse me -- Valentino is Mr. Dewitt, then

12 that's a foundational part of their case that money was

13 exchanged for what they're going to argue is drugs.  And I say

14 there's not enough guarantees of independent evidence or

15 corroborating circumstances.  For that, I'll concede on the

16 Val.  I'll still hold my position, but I won't argue that as

17 fervently as I'll argue Valentino, that that name and that

18 inference, or not even that inference, that argument that's

19 going to be made by the Government that, yes, here clearly this

20 is Valentino, it's Valfonso, I don't think is there.

21      I cited the *Dargan* case.  I know it's a little bit of a

22 different scenario, but it's a case where you have two people

23 talking about someone who is not present to hear the

24 conversation.

25      I read Mr. Izant's motion with respect to the

1  co-conspirators' statements and how that works.  But I still

2  think under 403 it can be excluded if the Court looks to the

3  factors that the *Dargan* court raised as to why they allowed

4  that particular testimony.  We don't have any of those here.

5  And that's my concern.  And it's such a pivotal piece of

6  evidence, I think, for both sides.

7          THE COURT:  So you won't have any objection if all of

8  the Val information comes in?

9          MR. GUILLAUME:  I would object.  But -- I would

10  object.

11          THE COURT:  It would be a tougher sell, right?

12          MR. GUILLAUME:  Correct.  But Valentino, for the

13  reasons I stated, is a bit different for me.  And because of

14  its importance in both of our cases, the Government's and mine,

15  quite frankly; but it is obviously extremely damaging for me

16  and it has the potential to put a big -- just to add a big

17  piece to the Government's conspiracy puzzle is the way I want

18  to phrase it.

19          THE COURT:  Okay.  All right.  Anything else before I

20  turn to the Government on that?

21          MR. GUILLAUME:  No, Your Honor.

22          THE COURT:  Anything else about the Government's

23  motion on recorded calls that you specifically need to address

24  now?  I mean, I understand that there may be calls that come in

25  that you're going to -- or the calls that are offered as trial

1   unfolds that you may object to as not meeting 801(d), you know.

2   The conspirator, the five elements for conspiracy.

3           MR. GUILLAUME:  Right.

4           THE COURT:  And I'll hear you at the time.  So just be

5   mindful that if those calls are coming up, right, you will have

6   talked to one another, figure out what calls the Government is

7   going to play at what time.  Just front the objection in

8   advance.  I think that would be easier than me trying to do it

9   in a vacuum today.

10      Does that make sense to you?

11          MR. GUILLAUME:  I agree.  And I'm still working

12  through the calls that the Government -- we've been in

13  communication and they've provided me an updated list.

14          THE COURT:  Okay.

15          MR. GUILLAUME:  We had a conversation a few days ago

16  about the calls.  I'm still working through.  I think I'm

17  probably not going to know for another week or so if I have any

18  serious objections to some of --

19          THE COURT:  To the ones that have been identified thus

20  far?

21          MR. GUILLAUME:  Correct.

22          THE COURT:  Okay.  Then let's just make it a standard

23  practice, let's do it in the morning before the jury is in the

24  box, if there are any calls that the Government has given you

25  notice, and I expect they'll give you notice, of what they're

1   going to play on that particular day, and you have an issue

2   with it, let me know, and we'll try to hash it out in the

3   morning.  Okay?

4           MR. GUILLAUME:  Yes, thank you, Judge.

5           THE COURT:  All right.  Mr. Izant.

6           MR. IZANT:  Thank you, Your Honor.  We have no

7   objection to that and we, weeks and weeks ago, provided an

8   initial list.  There were upwards of 10,000 pertinent

9   interceptions in this case.  We provided an initial list that

10  was less than 85 --

11          THE COURT:  Okay.

12          MR. IZANT:  -- when there were two defendants going to

13  trial.  And in light of Ms. Shelton's plea yesterday, we

14  provided a truncated list of a total of 65 text messages and

15  phone calls, it's about 45 calls, 15 text messages, roughly

16  that amount.

17          THE COURT:  How much total talk time?  I'm just

18  curious.

19          MR. IZANT:  Well, Your Honor, there's the total talk

20  time in the call --

21          THE COURT:  Yes.

22          MR. IZANT:  -- and that's different from what we

23  intend to play.  Not the entirety of the call is even

24  transcribed because we didn't believe it was necessarily

25  pertinent.

1        **THE COURT:**  Okay.

2        **MR. IZANT:**  Pertinent in a trial sense, not pertinent

3    in an interception sense.  But we expect, based on the number

4    of witnesses and the number of calls, that we could wrap the

5    Government's case up by Friday.

6        **THE COURT:**  So this is now a weeklong --

7        **MR. IZANT:**  We expect this now to be a weeklong trial.

8        **THE COURT:**  Of course I'm not going to hold you to it.

9    There may be more.

10        **MR. GUILLAUME:**  I'm sorry, Your Honor, if I can

11    interrupt.  On that note, Mr. Izant talked about the fact --

12    and I appreciate that they want to truncate the trial time.

13    However, we haven't made a firm decision, there may be calls we

14    want to play in their entirety.

15        **THE COURT:**  Okay.

16        **MR. GUILLAUME:**  To give the jury context.

17        **THE COURT:**  Okay.

18        **MR. GUILLAUME:**  But I'll try to identify those.

19        **THE COURT:**  So I understand, the Government has given

20    over the calls from which you intend to play excerpts.  You've

21    given over the calls in their entirety?

22        **MR. IZANT:**  That's right.

23        **THE COURT:**  So that's a much longer feed than what the

24    Government intends to play and, Mr. Guillaume, you may wish to

25    have some additional parts of the conversations played under

```
 1   Rule of Completeness.  Am I getting that right?

 2             MR. GUILLAUME:  Correct.  And I want to just put the

 3   Court on notice that I don't think I'm going to do this but I

 4   would like to reserve the right to if we get to a point that I

 5   think I may want to play the entirety of most calls that we be

 6   allowed to do this on the Rule of Completeness.

 7        I know a lot of these calls, Your Honor, a lot of them are

 8   not that long.  But some of them, I think, give a lot of

 9   context to what's going on generally from our -- without kind

10   of stating our strategy -- but as far as things we want to

11   maybe argue.

12        I may seek to play -- I don't want the Court to look at me

13   funny when I say can we play the whole entire call.

14             THE COURT:  So, again, I think the way to handle this

15   is, theoretically, that sounds like it will be a Rule of

16   Completeness argument, and there's relevance questions in that

17   respect.  You're entitled to play the entirety of a call to

18   round it out, right.  But I don't know if that means if the

19   call is two hours --

20             MR. GUILLAUME:  No.

21             THE COURT:  -- and you're talking about going to the

22   grocery store.  So you know the contours of this, right, as

23   does the Government.  It sounds like you're working well

24   together and that you can front this for one another with -- I

25   understand limitations about disclosing defense strategy.
```

```
 1          My bottom line is, if you come to a point where you're
 2   concerned, you need some court guidance, let me know.
 3   Otherwise, I would expect that you would play your portion of
 4   the call on cross of the sponsor of the recording.  So you all
 5   have to make sure -- you can facilitate that.
 6          MR. IZANT:  We will.  And we can also work together.
 7   If there's a -- let's say two-minute call, and we want to play
 8   90 seconds and Mr. Guillaume wants the last 90 seconds, we can
 9   do that on direct.
10          THE COURT:  Okay.  And then, Mr. Guillaume, if you
11   want to roll that way.  I mean, so what I'm expecting is
12   that -- by when will the Government have, or have you already
13   done this, a firm preview for Mr. Guillaume of what calls
14   you're going to play and what excerpts of the calls?
15          MR. IZANT:  We've already done that.
16          THE COURT:  You've already done that, okay.  So now,
17   Mr. Guillaume, the ball's in your court as to whether you can
18   communicate to the Government which calls you want either more
19   or the entirety played or potentially even so.  Even if you
20   just sort of red flag it, these are the ones we're likely to
21   want, something more --
22          MR. GUILLAUME:  Right.
23          THE COURT:  Then you all can work out the mechanics of
24   that and then make a decision on game day as to whether you
25   want it on direct or cross.  That I leave to you, okay.
```

1    Does that make sense?

2            MR. GUILLAUME:  Yes.  Thank you, Your Honor.

3            THE COURT:  All right.  So, Mr. Izant, on the direct

4    question of Val versus Valentino, where are you?

5            MR. IZANT:  Well, I think the Court understands our

6    argument.  We responded to this at ECF-101.  Without belaboring

7    the point, I would just highlight three overall messages from

8    the Government's response.

9        First, we think that the question is actually not even

10   relevant because we believe that these are statements in

11   furtherance of a conspiracy by a co-conspirator.  So even if --

12   when Mr. Gatson is referring to Val or Valentino he's thinking

13   of somebody else, those calls should come in because Mr. Gaston

14   thinks --

15           THE COURT:  Well, not so much.  I think that's a very

16   creative legal argument, but it really runs into 401 and 403

17   problems, right.

18           MR. IZANT:  It could.  But there's also supporting

19   evidence that corroborates it, right.  So we think there's

20   enough evidence to infer based on the co-conspirator statements

21   that Mr. Dewitt is Valentino.

22           THE COURT:  Let's stay there, I guess let's stay there

23   because --

24           MR. IZANT:  Okay.

25           THE COURT:  -- legally, to go beyond that gets, I

 1  think, into 403 problems.

 2          **MR. IZANT:**  Okay.

 3          **THE COURT:**  If the Government's fallback argument is

 4  even if it's not Mr. Dewitt it comes in anyway because it's

 5  somebody else who is not charged but is a theoretic

 6  co-conspirator, then I'm going to exclude it because it's too

 7  prejudicial and not terribly probative.

 8          **MR. IZANT:**  Sure.

 9          **THE COURT:**  You've got a lot of conspirator liability

10  calls and it risks great confusion.  But it sounds like your

11  argument is really there is enough along the lines of identity

12  to make this a question for the jury, not a question of

13  exclusion.

14          **MR. IZANT:**  That's exactly right.

15          **THE COURT:**  Let me hear you on that.

16          **MR. IZANT:**  So we submit that this is a jury argument

17  because I think there's enough evidence for the jury to

18  conclude that Val and Valentino are DeWitt.

19      On the specific facts, I hear Mr. Guillaume conceding that

20  perhaps Val is close enough, but maybe Val is too different

21  from Valentino.  We would simply point out that Val is

22  shorthand for Valentino and the jury is entitled to conclude

23  that.

24      In terms of the factual basis, there is this May 2019

25  exchange where Mr. Dewitt is surveilled and before that call

1   Mr. Gatson says:  I'm bringing something to Val or Valentino.

2        And after that exchange he said:  I brought something to

3   Val or Valentino.

4        And what's important is that Mr. Gatson is using Val and

5   Valentino interchangeably.  This is at Page 4 and 5 of ECF-101.

6        Before the call he says:  I'm gonna run to see Val because

7   I'm taking something back to him.  And he's shaking some bushes

8   that things might be happening.

9        And then on May 30th, when Gaston calls Co-Conspirator B

10  the next day he says:  I was in Newark yesterday and Valentino

11  came to see me.

12       And, in addition, he clarifies that Valentino's number

13  starts with 917, which is the phone that Mr. Dewitt was using

14  and responding to Val on.  So, really, I think this actually

15  isn't a difficult question for the jury to conclude that Val

16  and Valentino are Mr. DeWitt.

17       THE COURT:  But for my purposes, it's is there a

18  sufficient foundation to plausibly say Mr. Dewitt is Valentino

19  for purposes of identity?

20       MR. IZANT:  That's right.  And we submit the answer is

21  yes even with that lower burden too.

22       THE COURT:  So, Mr. Guillaume, I have taken a close

23  look at this.  I'm going to deny the motion.  I do think it's a

24  jury question.  If there were no other indicia but this one

25  call, or the calls setting up the Newark meeting, perhaps, and

1    I think that's largely how the motion presented at first.

2         But then in response there's the indicia that we talked

3    about today.  The independent reference on the phone that is,

4    there's no dispute, is Mr. Dewitt's.  It begins with the same

5    area code.  Others refer to Mr. Dewitt as Val.  And Val and

6    Valentino are quite close.  Mr. Gatson interchangeably refers

7    to this person as both Val and Valentino.  And that's another

8    sort of link in the inferential chain.  And that is, in my

9    view, sufficient foundation to allow the identity argument to

10   be made.  Is there two sides to it?  Absolutely.  Will you be

11   free to run a truck through it if you can?  Sure, in front of

12   the jury.

13        But the Government is going to be permitted to play the

14   Valentino call or calls as long as it otherwise meets

15   co-conspirator eligibility.

16        And, Mr. Guillaume, you too can under Rule of Completeness

17   bring in what you think you need, pending review and

18   fighting -- hopefully there won't be too much fighting -- to

19   undermine that and you can make those arguments.  But as to the

20   Motion to Exclude, I'm going to deny it.

21        So that was ECF-88.

22        And 85, at this point I think I'm just going to deny it as

23   moot because it's not -- there isn't anything specific,

24   Government, that you're saying you want in and the defense is

25   objecting at this point, right?

1        **MR. IZANT:**  That's correct.  There's not really a live

2   issue yet.  We've disclosed the calls that we want to play.

3   We've truncated that.  We've even explained who our witnesses

4   are going to be to the defense.  We've been very transparent

5   about what's happening here.  I don't understand there to be a

6   particular objection about a particular call.  But if there is

7   we're happy to address it.

8        **THE COURT:**  So maybe the better way to put it is not

9   ripe.

10        **MR. IZANT:**  Sure.

11        **THE COURT:**  You've fronted it, we just don't know if

12   we have an issue yet.

13        **MR. IZANT:**  And we thought it was important to lay it

14   out in writing in advance of trial so the Court can see who

15   we're talking about and what our theory is.

16        **THE COURT:**  This will resolve 85 as denied, not ripe

17   for resolution.

18        88 is denied.

19        89 is a Motion in Limine to Exclude Expert testimony.

20   It's titled On GO Location and Coded Language but the thrust of

21   the motion was the expert on coded language.

22        **MR. GUILLAUME:**  Right.  I don't know that I used -- is

23   that Mr. -- I have it at 89 as well.  Is that Mr. Eisele's?

24        **THE COURT:**  Let me see.  I thought it was --

25        **MR. IZANT:**  I think Your Honor is referring to the

1    first sentence but the title is what Mr. Guillaume --

2              THE COURT:  Oh, you're right, it's the first sentence.

3    This is my notes.  So, Mr. Guillaume, it is your motion.  It

4    says Purported Expert Testimony on Coded Language and GPS

5    Location Data.

6              MR. GUILLAUME:  I think the GPS location data was

7    originally in there.  I'm sorry, I didn't realize I didn't take

8    that out.

9              THE COURT:  So it is about the coded language?

10             MR. GUILLAUME:  Coded language only, correct.

11             THE COURT:  Okay.  Is there anything that you want to

12   add to the motion?  Because I know that since you filed that

13   motion, the Government seems to have made some supplemental

14   disclosures.  I think there was an exhibit where you laid out

15   each of the calls and what you expect your expert to testify

16   to.  And so now -- and I would imagine some of those have

17   since -- you're gonna back out because Ms. Gaston --

18             MR. IZANT:  A number of those.  And we've sent an

19   updated version of that chart to the defense as well.

20             THE COURT:  Got it.  How should we slice and dice this

21   one, Mr. Guillaume?

22             MR. GUILLAUME:  Well, Your Honor, it's really more so

23   for guidance in the sense that we believe -- my understanding

24   from doing trials in the past that we have the opportunity to

25   voir dire the expert prior to the court deciding whether that

 1 | person is an expert.

 2 |         **THE COURT:**  Yep.

 3 |         **MR. GUILLAUME:**  But I don't know whether the rule

 4 | change, the Rule 16 change, required -- so let me just say a

 5 | different standard in the sense that the Government has given

 6 | us a list of calls.  They've given us what they believe the

 7 | calls -- what the interpretation of those calls is.

 8 |         **THE COURT:**  Yep.

 9 |         **MR. GUILLAUME:**  Which we appreciate.  But the thing --

10 | the one thing that is missing and maybe we don't -- the rule

11 | doesn't require this, but I hope that it does, is the basis for

12 | that opinion.

13 |         **THE COURT:**  I think the rules of evidence do and also

14 | the amended rule.

15 |         **MR. GUILLAUME:**  So when I say the basis, this is not

16 | in this case, but let's say "girl" is cocaine, for example.

17 | Why does this particular witness believe that.  Normally we

18 | flush it out in voir dire.  But I have the equivalent of that.

19 | I have this means this but I don't have the why, the belief of

20 | the witness as to why.

21 |         **THE COURT:**  Okay.  Well, and that's a fair point, and

22 | it is under Rule 16 that is a new -- well, the rule has changed

23 | December 1, 2022, to make it more in conformity with the civil

24 | standard that we often see in civil cases.  And it does require

25 | that the summary, quote, describe the witness' opinions, the

1  bases and reasons for those opinions, and the witness'

2  qualifications.

3      Has that disclosure been made?

4      **MR. IZANT:**  Well, Your Honor, we explained the basis

5  and reasons for the opinion.  But this is -- I think this gets

6  directly at the heart of the issue which is something the

7  Fourth Circuit addressed in *Smith*.  A drug language expert --

8      **THE COURT:**  Does not have to do a one-to-one.

9      **MR. IZANT:**  Exactly.

10     **THE COURT:**  Right.

11     **MR. IZANT:**  And it's not like a medical professional

12 saying, well, I reviewed these studies and based on these

13 studies here's the answer I give you.  This is, I'm an expert

14 in the way people in these activities talk.  I've been doing

15 hundreds of cases.  I've talked to people who are involved in

16 them.  Based on all of my experience, just like someone

17 studying the Spanish language, for example, I know that this

18 word means that.

19     **THE COURT:**  Have you done that, though?  What I see at

20 101-1, I see a page and a half of a letter that was sent to

21 counsel and it doesn't -- it gives a summary of what he's going

22 to say, but it doesn't say his training, education, experience,

23 or the bases for those opinions even generally.  Am I missing

24 something?

25     **MR. IZANT:**  You are, Your Honor.  There's another --

1  that was in the original.  So, first of all, 101-1, it explains

2  that he will base his testimony and opinions on his review of

3  the materials in discovery as well as his law enforcement

4  experience and training as previously described.  And the

5  previous description was actually attached to Ms. Shelton's

6  motion, ECF 87-1.

7         THE COURT:  And I don't have that.

8         MR. IZANT:  I have a copy.

9         THE COURT:  Do you?  That would be great.  Sure.

10        MR. BUTLER:  May I approach, Your Honor?

11        THE COURT:  Sure.

12        MR. BUTLER:  Would you like me to hand it to the

13 clerk?

14        THE COURT:  No, you can hand it right up.  Thank you.

15 So this is 87-1 and this appears to be a subsequent disclosure.

16 No.  Previous?

17        MR. IZANT:  This was the initial.

18        THE COURT:  Okay.  Can I just take a second and read

19 this?

20        MR. IZANT:  Yes.  Thank you.

21        THE COURT:  Okay.  You attached his CV.

22        MR. IZANT:  That's right.

23        THE COURT:  Okay.  All right.  With this supplement,

24 which I reviewed, Mr. Guillaume, what's the specific objection

25 that this supplement -- not supplement, but ECF-87-1 plus

1  ECF-101 doesn't satisfy Rule 16?

2          MR. GUILLAUME:  Your Honor, my concern is that in this

3  case the vernacular is going to be very important.  Your Honor

4  hasn't listened to the calls, you will in trial.  But it's very

5  unique in our perspective in that a lot of the terminology -- I

6  know every case is different.  In my reading of *Smith*, before I

7  get into that, even though it's not a one-for-one necessarily,

8  the Court focused on the quality of the agent's experience.

9          THE COURT:  Right.

10          MR. GUILLAUME:  And with a case like this I believe,

11  it's our opinion, that many of the words that are being used by

12  our client are part of his vernacular because of his age,

13  because of his background, and the question -- so I'm going to

14  obviously deal with that on cross.  But it would be helpful to

15  know ahead of time when the -- for example, why does he believe

16  X word means -- is drug related?  And I always have these

17  issues in these cases where -- but this is a very particularly

18  interesting one because the language is so intentionally a big

19  part of it and I never had such a unique vernacular, I'll say,

20  as Mr. Dewitt's.

21          But I just was under the impression that the new rule

22  required a bit more.  That it required not necessarily a

23  one-for-one, but more specificity with respect to the language

24  itself, if that makes sense.

25          I'm not challenging his qualifications per say.

1        **THE COURT:**  But are you?

2        **MR. GUILLAUME:**  I am, I guess I am challenging --

3        **THE COURT:**  Right.  Because I think that -- I'm trying

4   to understand this.  Okay.  So you already have what the final

5   opinion is going to be.

6        **MR. GUILLAUME:**  Absolutely.

7        **THE COURT:**  You've got the laying out, the

8   translation?

9        **MR. GUILLAUME:**  Right.

10       **THE COURT:**  And you have a general background of

11   training, education, experience.  And you have that the basis,

12   essentially, is that general background.  Now I'll give you,

13   there's not -- I mean, you say you're not asking for a

14   one-to-one, and I'm trying to imagine what else the Government

15   could provide that will give you what you think you need

16   besides a one-to-one.

17       **MR. GUILLAUME:**  Well, I would like a one-to-one.  That

18   would be quite helpful.

19       **THE COURT:**  I'm not really sure you're entitled to

20   that.  But are you asking that you have more information about,

21   which again you can ask in voir dire, things like the number of

22   fentanyl seizures --

23       **MR. GUILLAUME:**  Right.

24       **THE COURT:**  -- the number fentanyl search warrants and

25   heroin and when and how?

1    **MR. IZANT:**  These are the things that I would ask

2    during voir dire that I normally do, but since the rule is very

3    new, the amended rules, excuse me, is new, I was under the

4    impression -- and *Smith* predates the rule, 2019, right, is

5    *Smith*, I think?

6        **THE COURT:**  Have you asked the Government these

7    questions?

8        **MR. GUILLAUME:**  Not specifically.  But I, you know,

9    just put it in the motion and I'll be more than happy to say

10   why does the agent believe this word -- if that's what the

11   Court is suggesting, I'll be more than happy to say why does

12   the agent believe this word, what's the basis for his opinion.

13   That would be quite helpful.  And if they say no, then maybe we

14   could hash that out again.

15       **THE COURT:**  But I think it's not so much why does he

16   think this word, right.  But if my understanding is that he's

17   going to be offered as an expert generally in drug-related

18   language, this is a heroin fentanyl case and there are words

19   that are being translated in that subsection, if you will,

20   like, sub-sphere of drug-related cases.  And so I think it's

21   fair that there might be some narrowing of the lens to focus on

22   the bases for opining in these kinds of cases, right.  That

23   might be a fair response.  Like, you need to know did this

24   officer, you know, participate in two fentanyl seizures or 200?

25       **MR. GUILLAUME:**  You're saying prior to the voir dire?

1          THE COURT:  Yes.

2          MR. GUILLAUME:  Yes.  On some of the issues we raised

3    in our motion there was a list of examples that I listed.  But

4    I'm more than happy to follow up with the Government with

5    respect to the things the Court suggested; and if I don't get

6    any what I deem is an adequate response, I guess we can reraise

7    it.  I don't think it's really a complicated issue, I'd like to

8    know what's the basis.  And he can tell me the basis is because

9    I read it in a book and that would be that's his basis, that's

10   his basis, and I would act appropriately after that.

11         THE COURT:  I see.  I think what I'm hearing,

12   Mr. Izant, is that to say it's generally sort of based on my 20

13   years of training, education, and experience is too broad; and

14   it doesn't really focus the defense on whether it has any

15   legitimate challenge to the basis and the reasons for the

16   opinions.

17        So to the extent, I think an interim step would be --

18   we've had this conversation, I think you know provisionally I

19   think would go far in providing to Mr. Guillaume what is the

20   more specific kinds of training, education, and experience in

21   fentanyl and heroin seizures.

22         MR. GUILLAUME:  Yes.

23         THE COURT:  And when, time frames, because that seems

24   to be relevant to your concern, Mr. Guillaume.  Is this the

25   last two years?  The last two years, right?  And having notice

 1 | of that will help the defense prepare.

 2 |      Beyond that though, I don't think, Mr. Guillaume, it would

 3 | be appropriate to say what's your basis for every single word,

 4 | especially at this juncture, right, until there's an issue.

 5 | There isn't really an issue because I think there's some more

 6 | fundamental disclosures that could be made.

 7 |      Mr. Izant, do you see any issue with that?

 8 |           MR. IZANT:  Well, I think, look, we're happy to

 9 | provide that information.  Frankly, we were planning to elicit

10 | that on direct anyway.  So happy to do it.

11 |           THE COURT:  Well, then, okay.

12 |           MR. IZANT:  I do note that in the CV it explains where

13 | the expert has been working and for how long so that

14 | information is available.  The question of how many fentanyl

15 | versus heroin seizures we haven't provided.  I'm not sure the

16 | witness would be able to say the exact number, but he would be

17 | able to say it's been more than one.  And so we're happy to

18 | provide that information.

19 |           THE COURT:  I mean, if you have it.  It's fentanyl and

20 | heroin, right?

21 |           MR. IZANT:  It's fentanyl and heroin.  Now, there have

22 | been references to other substances during some of the calls

23 | just in the course of referencing to fentanyl and heroin.  He's

24 | going to opine on that too.  He's going to say, when Mr. Gatson

25 | says he's getting 1H and 1 Coke, that means heroin and cocaine

1  to distinguish it from when he's talking about fentanyl.

2         THE COURT:  Let's do this then.  Mr. Guillaume, you

3  put to the Government the areas in which you think you are --

4  not one-for-one words, but what areas of training, education,

5  and experience do you think you need more information.

6         And, Government, if you're intending to elicit it on

7  direct, you know, be forward-leaning with the defense and give

8  it in advance because it'll moot a lot of the back and forth

9  during voir dire about having not gotten it.

10        MR. IZANT:  Certainly.

11        THE COURT:  And it'll provide the foundation and

12  comply with the rule and we'll be good to go.

13        MR. IZANT:  Yes.

14        THE COURT:  If there is a lingering issue then we'll

15 try to take it up obviously before the jury's in the box, but I

16 hope that there isn't.

17        Let me say this, I'm going to deny the motion of what

18 you're asking for as a one-to-one for each word what the basis

19 is, that's not required.  On the other hand, what is required

20 is some specificity going beyond just -- I mean, this would be

21 akin to:  I'm a doctor, I went to medical school, therefore I

22 can opine on the inner-workings of the kidney.  Without a

23 little bit more about why this doctor can opine on the

24 inner-workings of the kidney, I'd exclude that expert.  So

25 that's sort of the analogy that I'm living in.

1      Mr. Guillaume, if you want to pen a letter to the

2   Government today and make your areas of inquiry known.  And

3   then, Government, you respond how you deem fit.  And if there

4   are any issues just alert me and we'll deal with it before

5   trial.  Make sense?

6           **MR. IZANT:**  Thank you, Judge.  We're happy to do that.

7           **MR. GUILLAUME:**  Thank you.  Yes, Your Honor.

8           **MR. IZANT:**  For the record, I don't think the Rule 16

9   language changed in this respect, basis and reasons.  Rule 16

10  before 2022 said basis and reasons.  So *Smith* still applies.

11          **THE COURT:**  Okay.  Great.  Thank you, right.  And I

12  don't think that the rule -- my understanding of the rule

13  change was just to bring it a bit more in line with civil

14  disclosure.

15          **MR. IZANT:**  Yes.

16          **THE COURT:**  So I'm not sure exactly what it is either,

17  but I wouldn't have thought that that rule changes *Smith* in a

18  substantive way.  And *Smith* is a commonsense response to a

19  tricky area of expert disclosures.  This area's just tough.

20          **MR. IZANT:**  Agreed.

21          **THE COURT:**  All right.  Very good.  So I think the way

22  I'll resolve 88 is to defer it.  Let's see -- not 88 -- 89, is

23  to defer and let's see where we are.  Okay.  If you get to

24  trial and haven't heard anything then it is, you know, it's

25  denied as moot.  If you want to reraise something in the

1    province of 89 it's deferred for now, okay.

2            **MR. GUILLAUME:**  Thank you, Your Honor.

3            **THE COURT:**  Ninety.  If I get it, Mr. Guillaume, is

4    your motion to essentially preclude TFO Jaramillo from being

5    able to offer on the stand his opinion as to what was in the

6    bag that was exchanged between Mr. Dewitt and Mr. Gatson in New

7    Jersey; am I right about that?

8            **MR. GUILLAUME:**  Right, Your Honor.  And just for

9    clarity sake, I don't know that it is Officer Jaramillo.

10           **THE COURT:**  I'm sorry.

11           **MR. GUILLAUME:**  Maybe it is, I might have put that,

12   but I'm not clear.

13           **THE COURT:**  He observed the meeting.

14           **MR. GUILLAUME:**  Whoever it is that observed.

15           **MR. IZANT:**  It's not going to be Officer Jaramillo,

16   Your Honor.

17           **THE COURT:**  Okay.  Sorry.

18           **MR. IZANT:**  It's going to be either Brett Allen or

19   John Fugett.

20           **THE COURT:**  Who both also observed?

21           **MR. IZANT:**  Who both observed, yes.

22           **THE COURT:**  Okay.  But there's no photographs or no

23   video of this, right?

24           **MR. IZANT:**  That's correct.

25           **THE COURT:**  So it's based solely on their eyes on.

1          MR. IZANT:  That's right.

2          MR. GUILLAUME:  This argument is pretty much identical

3  to the first argument I made with respect to corroborating --

4  it's a bit of a different -- I don't think that the

5  Government -- well, I'm going to try to put it the right way.

6  I think that they can say that a meeting took place, obviously.

7  They can talk about their observations.  But for reasons

8  stated, 403 reasons, potentially, the potential that this --

9  they may have suspected a money drop, but I don't know that

10  there's enough to corroborate that there actually was a money

11  drop and just not a drop off of laundry or something like that.

12          And I think it's such an important piece, again, in both

13  cases that --

14          THE COURT:  I get what you're saying.  Essentially

15  it's speculative.

16          MR. GUILLAUME:  Right.

17          THE COURT:  No matter how many times you've seen a

18  money drop, the central question is is this a money drop.  And

19  it is not like lay opinion that we're used to, such as

20  something that is beyond akin of the jury, like, what a drunk

21  person looks like.  A TFO who has pulled over 100 drunk people

22  knows the signs better or --

23          MR. GUILLAUME:  Exactly.

24          THE COURT:  -- or drug paraphernalia.  You know, it's

25  a tough line but what certain drug packaging might look like

```
 1    that the jury wouldn't know that.  They would just think that
 2    it's a ziplock.  But it can be used in ways by the drug trade
 3    that an officer experienced might be able to aid something.
 4         What I'm hearing you say is, listen, describe the bag all
 5    you want, but it's ultimately speculative to say what's in
 6    inside of it if you didn't open it up or see it yourself?
 7              MR. GUILLAUME:  Correct.
 8              THE COURT:  Okay.  Government?
 9              MR. IZANT:  Well, if I understand the Court's view on
10    this, I hear the Court to be saying not inclined to admit the
11    opinion that money was exchanged but I think the --
12              THE COURT:  That there was money in the bag, yeah.
13              MR. IZANT:  That there was money in the bag.  But I
14    think the witness should be able to explain I saw brick shapes
15    or however the --
16              THE COURT:  Yes.
17              MR. IZANT:  -- witness plans to described what it
18    looked like on the outside.
19              THE COURT:  He just can't say it looks a whole lot
20    like money because he didn't see inside the bag, right?  So why
21    don't you proffer what you believe the witness would say in
22    terms of describing the details of this bag from how far away,
23    what was the substance?  You know, give me the whole -- as much
24    of the proffer as you can as to what you expect the witness
25    would say.
```

1      **MR. IZANT:**  Sure.  Your Honor, as much as I can is at

2   ECF-101, Page 7 to 8.  I expect he'll testify that it looked

3   rectangular-shaped and heavy and appeared to contain stacks

4   inside, specifically stacks of bundled currency.

5      **THE COURT:**  Well, that part is not coming in.  That is

6   not -- I mean, if this is an opaque bag -- what was it made of?

7      **MR. IZANT:**  Plastic.

8      **THE COURT:**  Plastic, okay.  So it's not opaque, right?

9   So you're saying that what the witness could say is that it

10  was, like, a trash bag or something?

11     **MR. IZANT:**  I can't answer that question.  I just know

12  black plastic, Your Honor.  We'll have more information before

13  trial, but. . .

14     **THE COURT:**  So, in other words, what you're saying is

15  the officer may be able to say, based on the shape and the

16  consistency of the bag, that there were hard objects in there,

17  they looked rectangular or square and, you know, brick-like, or

18  however the person would describe it.

19      But what that officer cannot know is what's inside the bag

20  without a seizure, and it is too inflammatory to say, you know,

21  it could be -- it could be drugs, it could be money, it could

22  be books, it could be bars of gold.  You know what I'm saying?

23  There's no way to separate -- the jury will come to the

24  decisions that the jury will come to based on the observations.

25  But I cannot find that this is opinion testimony without it

 1  really bleeding into speculation.  That's where I am.

 2          MR. IZANT:  Understood, Your Honor.  The question I

 3  would then have for the Court is not as a matter of the truth,

 4  but why do the agents go from D.C. area where they're based to

 5  go surveil this meeting based on the wire calls.

 6          THE COURT:  Okay.

 7          MR. IZANT:  I anticipate they would testify, based on

 8  the wire calls, we thought Mr. Gatson was bringing Mr. Dewitt

 9  money so we went to go watch.

10          THE COURT:  Sure.  And I think that that is

11  legitimate, it's appropriate.  You might ask for a cautionary

12  instruction, Mr. Guillaume, like, this is just their hunch or

13  whatever.  You know, it's not offered for the truth.

14          MR. GUILLAUME:  Right.

15          THE COURT:  It's offered to explain why they did what

16  they did, and that is appropriate and a cautionary instruction

17  could be appropriate as well.

18          MR. GUILLAUME:  Yes, I agree, Your Honor.

19          THE COURT:  Okay.  That is fair.  But that still

20  doesn't permit the officers to tell the jury what they think is

21  inside without evidence of what they think is inside.

22          MR. IZANT:  I understand the Court's ruling.  Their

23  answer as to what's the evidence is I've seen money drops

24  before, this looked like a money drop.  That's the argument.

25          THE COURT:  Right.  And that just bleeds way into --

1  in my view this is not lay opinion testimony and to the extent

2  it is, it's 403.

3          **MR. IZANT:**  Understood.

4          **THE COURT:**  It's just too prejudicial without being

5  probative given that there wasn't any sort of contemporaneous

6  seizure.  But you can argue it.  Okay.

7          **MR. IZANT:**  We will.  Thank you.

8          **THE COURT:**  All right.  Okay.  That is ECF-90.  Does

9  that conclude all of the in limine motions?

10         **MR. GUILLAUME:**  From our point, yes, it does, Your

11 Honor.

12         **MR. IZANT:**  Yes, Your Honor.

13         **THE COURT:**  So ECF-90 is granted.

14     Let's now talk about --

15         **THE CLERK:**  Your Honor, we have ECF-86 as a live

16 motion.

17         **THE COURT:**  Which one is that?  Are you sure that's

18 not Mr. --

19         **THE CLERK:**  It's filed by the Government.

20         **MR. IZANT:**  So this is the Government's Second

21 Affirmative Motion in Limine.

22         **THE COURT:**  Okay.

23         **MR. IZANT:**  We would withdraw this motion because it's

24 moot for the guilty plea.

25         **THE COURT:**  Oh, that's right.  It was applicable only

1  to Ms. Shelton.

2          **MR. IZANT:**  That's right.

3          **THE COURT:**  Okay.  Thank you.  So we'll deny as moot.

4      So the voir dire is going to have to be altered to account

5  for Mr. Dewitt only being in so we'll make those changes.  I do

6  apologize that you didn't get it before today and that it is

7  not in the shape of which we've grown accustomed when Ms. Brown

8  is not away for a couple of days.  So I do apologize for that.

9      Let's start with the beginning.  I have a couple of

10  questions.  For number one, what should I tell the jury about

11  the estimated length?  Up to two weeks sounds scarier than I

12  think it's going to be so I want to give them a better

13  estimate.

14          **MR. GUILLAUME:**  I think a week.  The Government said a

15  week.  We don't have any witnesses that we intend to call, Your

16  Honor.

17          **THE COURT:**  So I'm going to say one week and I'll

18  soften it a bit by saying there's the potential it bleeds into

19  the next week for things like deliberations but so you know

20  plan about a week.  Fair?

21          **MR. IZANT:**  That works, Your Honor.  Thank you.

22          **THE COURT:**  All right.  So we will change one.  I will

23  change the defendants to defendant and take out the references

24  to Ms. Shelton.

25      The first -- there were some objections to certain

1  questions that I think I have taken out so I'm going to

2  renumber accordingly but let's get to the redline.

3       All right.  The substantive changes start around Question

4  10.  Let me do it this way, does anyone have any objection to

5  the changes in current Question 10 through 20?

6            MR. IZANT:  Your Honor, the Government had objected to

7  what I think is question purple 14.  I think that this question

8  is a little bit too broad and vague because, you know, would

9  you tend to believe an expert witness just because they're

10  found to be an expert?

11      If they're deemed an expert, that is a factor the jury can

12  rely on.  I think if we want to get into this in voir dire, we

13  might as well reference the jury instruction on expert

14  witnesses.  So we'd want this to be more fulsome than what it

15  is now.

16            THE COURT:  Do you have a suggestion for what you

17  think the -- because I think, Mr. Guillaume, you want this

18  question?

19            MR. GUILLAUME:  I'm looking at it now, Your Honor.  If

20  I could have a moment?

21            THE COURT:  Yes, because I'm not sure who of the

22  counsel had requested it.

23            MR. IZANT:  I think this was Mr. Eisele.

24            MR. GUILLAUME:  It was.  He and I were kind of working

25  together here and there.  So. . .

1    How does the Court plan to address, if at all, expert

2  witnesses in voir dire?  If this was to be removed would there

3  be any --

4          THE COURT:  No, and that's why it's a call you have to

5  make.  There's only one expert being called, right?

6          MR. GUILLAUME:  That's right.

7          THE COURT:  So the strategic decision is do you want

8  to highlight it for the jury or not?  Do you want to mine it

9  with the jury or not?  If you do, I'll talk to you about how it

10  might be modified.  If you don't for strategic decisions then

11  let me know and it moots the issue.

12          MR. GUILLAUME:  Can I speak with my client for one

13  second?

14          THE COURT:  Sure.  Yep.

15          MR. GUILLAUME:  Your Honor, we would like -- it

16  doesn't have to be the exact wording but we would like the

17  expert witness question to remain in some form.

18          THE COURT:  So I'll ask the Government, what

19  modification do you think would address the concern you have?

20          MR. IZANT:  So I think just borrowing from our

21  proposed jury instruction 35 on Pages 25 and 26 of the jury

22  instructions.  I don't know if the Court has that accessible.

23          THE COURT:  I don't but maybe you can read to me what

24  you think is relevant to change.

25          MR. IZANT:  So I think we could mirror the other

```
 1  questions that sort of state a premise from the instructions,
 2  say, will you follow this.
 3           THE COURT:  Right.  Okay.
 4           MR. IZANT:  So I'll instruct you that a witness may be
 5  permitted to testify or may be qualified to offer an expert
 6  opinion.  I will instruct you that in weighing this opinion
 7  testimony you may consider the witness' qualifications,
 8  opinions, reasons for testifying as well as all the other
 9  ordinary considerations that apply.  You may give the opinion
10  testimony whatever weight, if any, you find that it deserves in
11  light of all of the evidence.  Will you follow this
12  instruction?  Can you follow this instruction?  I can wordsmith
13  that better --
14           THE COURT:  It doesn't really get to the bias.  I
15  think the call of the question is just because someone is
16  called an expert, will you give them more consideration because
17  they're called an expert.  And your point is they can do that,
18  is that what you're saying?
19           MR. IZANT:  My point is they're deemed an expert
20  because of their qualifications, and they're allowed to
21  consider their qualifications in determining how much weight to
22  give their opinion.  So I think just to say, would you believe
23  them just because they're an expert glosses over they're deemed
24  an expert because of these qualifications.
25           THE COURT:  Yes, it does confuse the issue.
```

1        **MR. GUILLAUME:**  Right.  So that's why I'm not married

2  to the wording, but my client -- we've talked, and we do want

3  to -- we do want to call out, like Your Honor says, potential

4  bias one way or the other with respect to the expert testimony.

5  Because that's a, you know, there's only one expert but it is

6  an important part of the case.

7        **THE COURT:**  It's sounds like you all are closer on

8  this than, you know, than not.

9        **MR. IZANT:**  We can work together.

10        **THE COURT:**  Right, exactly, to come up with something

11  that is perhaps just a bit simpler than the instruction itself

12  but does do what you're suggesting which is state a premise

13  that is an accurate reflection of the law on expert testimony

14  and then ask the jury if they'd be willing to follow it.

15        And I would ask for you all to submit that -- you can do

16  it by, like, one letter on ECF saying this is our joint

17  proposal or these are our competing proposals for purple 14.

18  And I'll put it in, make a decision and put it in the final.

19        Make sense?

20        **MR. IZANT:**  Yes, Your Honor.

21        **MR. GUILLAUME:**  Sure.

22        **THE COURT:**  All right.  Anything else to 20 before we

23  move on?

24        **MR. IZANT:**  Not from the Government Your Honor.

25        **MR. GUILLAUME:**  Your Honor, was the question -- I'm

```
 1   sorry --
 2             THE COURT:  Any objections up to Question 20?
 3             MR. GUILLAUME:  Up to 20.
 4             THE COURT:  Then we'll do the next set.
 5             MR. GUILLAUME:  No, Your Honor.
 6             THE COURT:  Okay.  Now I'll ask the same question of
 7   21 through 30.  And this is purple 30, like, new 30.
 8             MR. IZANT:  I believe, is it Your Honor who has
 9   proposed to strike 26 and 29?  Because I don't believe that was
10   submitted by the parties.
11             THE COURT:  I did because I thought that they were
12   redundant.  I thought we had them.  No, actually I moved them.
13   One is I moved it to where it flowed more naturally, I thought,
14   because I know that there's always a question about serving as
15   a juror.  And I think -- oh, I know what I did.
16        Twenty-eight:  Have you ever served on any jury in either
17   state or federal court?  And usually 50 percent of the time the
18   jurors don't really know whether it was civil or criminal
19   anyway and you have to talk to them a little bit so I'll just
20   emphasize any jury and that usually gets the answer we need to
21   explore the rest.
22        And then 26, a Government agency bringing a civil claim is
23   usually going to be captured somewhere else.  It's a
24   complicated question.  I guarantee people are going to be,
25   like, what does that mean.  They're going to check it yes, out
```

1  of an abundance of caution, and we're going to spend an undo

2  amount of time on whether an agency brought a civil claim

3  that's so broad that it really doesn't get to any issues in

4  this case.  That's why I struck it.

5          MR. IZANT:  I'm fine given Question 12, which I think

6  gets to the same concern.

7          THE COURT:  Okay.  Yes, I agree with you.  Okay.  Very

8  good.  And I was trying that because we were at, you know, we

9  were topping over 40 questions for a relatively straightforward

10  case.  I was trying to pare it down a little bit.

11          MR. IZANT:  Fair enough.

12          THE COURT:  So that addresses the eliminations.

13      Anything else before we talk about 31 through 40?

14          MR. IZANT:  Not from us, Your Honor.

15          MR. GUILLAUME:  No, Your Honor.

16          THE COURT:  All right.  Thirty-one through 40.

17          MR. IZANT:  So, Your Honor, on 31, purple 31, I

18  believe this came from the Court's prior voir dire in the MS-13

19  trial from last fall.

20          THE COURT:  It did.  The reason why I struck it is I

21  will tell you in the last six trials no one has answered yes to

22  this.  It just doesn't go anywhere and it takes up -- as a

23  matter of fact people are, like, of course, like, Law & Order

24  doesn't matter.  Sometimes I'll get someone who is confused

25  about why it's even asked.  So that just takes up time.  And

 1   this isn't a case in which forensics are going to be an issue

 2   anyway, right?  No fingerprints or DNA or anything like that?

 3          MR. IZANT:  There won't be any fingerprints or DNA and

 4   I don't know if there's going to be a defense about the lack

 5   thereof.

 6          THE COURT:  Right.

 7          MR. IZANT:  And the concern the Government always has

 8   about this question is are expectations not where they should

 9   be.  That's why we were perfectly happy with that question

10   remaining in.  We submitted jury instructions.  I don't think

11   there was an objection on this.  There is an instruction about

12   no specific techniques required.

13          THE COURT:  Yes.

14          MR. IZANT:  Which gets to the same concern but that's

15   obviously after the fact.

16          THE COURT:  Which is why I thought overall that

17   instruction adequately handles any sort of question.  But a

18   question about CSI or Law & Order, which I think you can only

19   watch on Peacock now and reruns.  I mean, I don't even know if

20   people watch it anymore, right.  It's just an outdated question

21   that hasn't gotten much bounce.

22          MR. IZANT:  Okay.

23          THE COURT:  Unless, Mr. Guillaume, you disagree and

24   want it?

25          MR. GUILLAUME:  No, I do not.

1      THE COURT:  And you're not going to be standing up in

2  opening statement and saying no fingerprints.

3      MR. GUILLAUME:  Not in my opening, no.  But is the

4  Court saying that -- whatever ruling the Court makes I'll abide

5  by, but I guess a point of clarity, there is a jury instruction

6  with regard to specific investigative techniques.

7      THE COURT:  Yes.

8      MR. GUILLAUME:  So if I were to say, I don't know that

9  I would to say it, there's no physical evidence.

10     THE COURT:  You can do that.  You can do that.

11     MR. GUILLAUME:  Specifically fingerprints are DNA.

12 It's not a focus of my case at all.  I can tell you that right

13 now.

14     THE COURT:  Well, you're not going to stand up in

15 opening statements and say, you've all seen this, you've heard

16 about it, it's common sense, if someone did something they're

17 going to leave behind DNA or something like that that would

18 really call this question into being.

19     MR. GUILLAUME:  No, no.  It's more of let's just see

20 the evidence, that's not revealing anything --

21     THE COURT:  That's fair.

22     MR. GUILLAUME:  -- but that's in every defense case.

23     THE COURT:  Right.  And I don't think that that

24 necessitates this question.

25     MR. GUILLAUME:  But I will say I would like to reserve

1   the right to challenge if I believe it's appropriate and raise

2   it in argument.

3          THE COURT:  Absolutely.  Right.  And that's why the

4   standard jury instruction I think adequately orients the jury

5   at the right time, which is, Government doesn't have any

6   particular obligation to do a particular thing to prove its

7   case.  They just have to prove its case.  Okay.

8      All right.  Great.

9          MR. IZANT:  Understood.

10          THE COURT:  So that's 31.  Any other objections to any

11   of the changes to the end?

12          MR. IZANT:  So, Your Honor, it appears that purple 33

13   is just being truncated.

14          THE COURT:  Correct.  Yeah, just trying to say it more

15   simply because it was a mouthful.

16          MR. IZANT:  We'll have to clarify in purple 34 that

17   it's singular, but is the Court on its own --

18          THE COURT:  I'm going to do that, that's right.  Clean

19   up all of it as best we can.

20          MR. IZANT:  Red 36 we didn't want in in the first

21   place.

22          THE COURT:  Yeah, I don't think it's appropriate.

23          MR. IZANT:  Thirty-five comes from the Court's prior

24   trial.

25          THE COURT:  Again, it was -- this is trial and error

1  about what appeared redundant.  So I did think about this after

2  we -- after I sent this.  And the one thing I think should be

3  included is in the next Question 36, any views about

4  prosecutors, law enforcement or defense attorneys that would

5  affect your ability to be fair.

6          MR. IZANT:  We'd be satisfied with that, Your Honor.

7          MR. GUILLAUME:  I would as well.  That's fine.  It's

8  perfect.

9          THE COURT:  Yeah, and that way we don't have to

10  presage what the problem might be.  We'll just hear about it if

11  they have one.  Okay, we'll make that change.

12      Anything else on the voir dire before we move on to next

13  topics?

14          MR. IZANT:  The only question I had, and this applies

15  to the verdict sheet and the jury instructions, but how should

16  the Government or the parties refer to the counts in light of

17  the counts that only -- in which only Ms. Shelton is charged?

18  So she is only in 2, 3, 4 and 5.  Mr. Dewitt is 7, 8, 9 and 10.

19  Should we modify everything to just renumber them 1 through 6?

20          THE COURT:  No, I think in the jury instructions if

21  there is a way to, I mean, it's no -- it's no secret that

22  Mr. Dewitt is charged with both conspiracy and distribution.  I

23  don't think it's going to be odd to say that Mr. Dewitt is

24  charged.  What an indictment is, we're going to give an

25  instruction on that.  What counts in an indictment are, and

 1  that he is charged in Counts 7 through 9.  And I'll give you

 2  instructions on each and we'll just go with 7, 8 and 9.

 3          **MR. GUILLAUME:**  Yeah, I would prefer not to highlight.

 4  It's gonna go past them anyway.  I would prefer just to keep it

 5  like it is.

 6          **THE COURT:**  Right.  Exactly.  Real simple, focused

 7  on -- but we don't have to renumber or change it or make it any

 8  different than the indictment nor do I think we have to really

 9  even explain it.

10      Does that make sense?

11          **MR. IZANT:**  Sure.  Thank you.

12          **THE COURT:**  Anything else before we talk jury

13  selection?  Okay.  So my first request of you all is out of an

14  abundance of caution, let's all have a gentleperson's agreement

15  that we'll test rapid the morning of.  So if we see each other

16  and there's no-calling off the show that means we're all

17  negative.  Okay.

18          **MR. IZANT:**  Is that the first day, Your Honor, or

19  every day of trial?

20          **THE COURT:**  I would say the first day.  And let me say

21  this, just generally, we'll make this known to the jury, I'm

22  making it known to you all, if you at any point are concerned,

23  you feel like you've got symptoms or -- let us know.  We have

24  rapid tests available on-site.  We've done it in many, many

25  trials when persons have raised, you know, they've learned that

1   their loved one is positive and want to know that they're okay

2   to go forward or you just don't feel good.  And we'll let the

3   jury know as well.

4        I'm going to instruct the jury that we're, unless speaking

5   during trial, everyone will be masked.  I'll let them know we

6   have HEPA filters everywhere, we've got PPE, we've got an

7   epidemiologist on call.  We have, you know, he's been with us

8   throughout the pandemic.  We've got a special air filtration

9   system all designed to put them at ease and make it clear they

10  don't need to worry about that.  They just need to focus on the

11  evidence and their job at hand.

12       If witnesses are not vaccinated, they too must test

13  negative the morning of their testimony.  So I'll leave it to

14  the Government to manage that.

15           MR. IZANT:  Yes, Your Honor.

16           THE COURT:  And we have customarily asked the question

17  as we're doing here about vaccination and during jury selection

18  Mr. Ulander will get early in the voir dire process who has

19  checked no, that they're not vaccinated.  And we'll know that

20  in advance.  And what I often do is ask you all, as their

21  numbers come up, do you wish to voir dire them or do you wish

22  to send them home.

23       Most of the time the parties are okay with sending home,

24  but I don't mandate that, and I'm not automatically striking

25  people for cause because they're not vaccinated.  There may be

1  particular reasons why you're interested in that potential

2  juror, and I'm not going to exclude them based on that.

3          So that's how we'll do it and you let me know as we go.

4  It also prevents us from getting backed against a wall in terms

5  of having enough jurors which we'll confirm -- I think we'll

6  have enough.  So that's with respect to vaccination.

7          Given that we are now looking at a week with only one

8  Defendant, I would imagine 14 jurors, 12 and 2, would be

9  sufficient.

10         **THE COURT:**  That's works for us, Your Honor.

11         **MR. GUILLAUME:**  That works for me as well.

12         **THE COURT:**  So that means we're going to need --

13  always makes me excited when I'm at least in the ballpark of

14  where I'm supposed to be.  I'm not a math person, I look to

15  Brian.  We're going to need 32.

16         So what this means is as we go through the process when we

17  get to 32 qualified jurors we will stop.  And then Government

18  and defense, you'll be able to exercise your peremptories.  And

19  we will have plenty if none of you have overlapping strikes so

20  we'll stop at 32.

21         Next question is because Mr. Dewitt is on release, my

22  proposal would be that we handle -- because we're going back to

23  prepandemic jury selection, we will not be doing remote jury

24  selection like we have been for three years.  All of the jurors

25  will be in the room.  I suggest if we have 32 that we need

1  maybe 20 extra, 55 should do it.

2        Do you disagree?  Do you think we need more?

3        **MR. IZANT:**  I was under the impression that the court

4  had already asked for 65.

5        **THE COURT:**  I did when we had more defendants.  I'm

6  wondering if we need as many now.  If you want to keep double

7  we can.  It just makes this room tight.  So do you think we

8  need more than 60 for one Defendant, not terribly high profile.

9        **MR. IZANT:**  Not more than 60, Your Honor, no.

10       **THE COURT:**  Then why don't we say 60.  Is that good,

11 Mr. Guillaume?

12       **MR. GUILLAUME:**  Yes.  Your Honor, I have a logistical

13 question.

14       **THE COURT:**  Yes.

15       **MR. GUILLAUME:**  Now that we're going back the old way,

16 are counsel going to approach the bench during the selection?

17       **THE COURT:**  That was going to be my next point.

18       **MR. GUILLAUME:**  Okay.

19       **THE COURT:**  So Phase I, everybody is in the room.  And

20 I go through the voir dire questions and each juror has their

21 yes and no answer sheets.  So we're going to do it like we've

22 done it during the pandemic.

23       For Phase II, when we are doing the individual voir dire,

24 my suggestion is that we do it in the jury selection --

25 deliberation room.  And here's why, especially if it's going to

1    be just counsel and Mr. Dewitt, it's four people.  We can put

2    in two HEPA filters.  You can actually socially distance

3    because we socially distance with 12 jurors and we've, knock on

4    wood, no one has gotten sick.

5        So you all can back up and give each other a lot of room.

6        The witness is at the front of the table, the court

7    reporter is directly across from me.  We, too, can social

8    distance.  And the advantage of doing it that way is that we're

9    not all crowded around each other spitting on each other

10   inadvertently, right.  It also goes a lot more quickly because

11   the witnesses are much more candid when they're in the room and

12   they're looking right at you.

13       So when we did it prepandemic for folks who are on release

14   it's just a much more pleasant process for everybody.  And no

15   one is listening to the husher for eight hours.  So unless

16   there is any objection to doing it that way, we will set it up

17   so that if you're talking, you're not masked.  Everybody else

18   is masked.  We'll have two HEPA filters running, and we'll do

19   the follow-up voir dire in the room.

20       Before I get into the details of how we mechanically do

21   for-cause strikes and all that, does anybody have a problem

22   with doing it that way?

23           **MR. IZANT:**  No, Your Honor.

24           **MR. GUILLAUME:**  No, Your Honor.

25           **THE COURT:**  Mechanically, the way we have done it is

1   Mr. Ulander is in charge of making sure that -- you know how

2   we've got five potential jurors on each sheet.  The five will

3   be seated or maybe he'll seat 10 in the jury box just to have

4   his queue in order.  We will go through the voir dire for the

5   first five and at the end, while Mr. Ulander is getting those

6   folks seated and the new ones up, I'll hear for-cause

7   challenges.  So we'll do them in groups of five.

8        I will tell you, though, that if we're in the voir dire

9   and someone just so patently seems unqualified to me for

10  obvious reasons, I will send that person out for a minute so

11  that we can just speed it along.  And I'll ask you all if you

12  object, and if you do we'll bring the person back in and you

13  continue.

14       But other than that, if there isn't anyone who is so

15  clearly not qualified for some reason, I'll hear for-cause

16  challenges at the end of every page.

17       Does that make sense to you all?

18            MR. IZANT:  Yes, Your Honor.

19            THE COURT:  Okay.  All right.  And then once we get to

20  32 you all will be able to do your preemptory thing and we'll

21  seat the jury.  I'm hoping we'll get it done -- be prepared if

22  we can, if by some wonderful stroke of efficiency and justice

23  get this done by 3:00 or so, that I would expect we open.  So

24  just be ready.  If it's beyond 3:00, I'm not going to make you

25  all open.  Let the jury go home and get a rest and come back

1 first thing in the morning.

2          MR. IZANT:  And no witnesses on Monday?

3          THE COURT:  Well, you know, I don't think we're going

4 to -- do you have one that could be on tap and ready to go if

5 necessary?

6          MR. IZANT:  Yes.  It's a witness who is actually

7 coming from out of town.  He'll be here on Monday even if he's

8 not taking the stand until Tuesday.

9          THE COURT:  All right.  I don't think we'll get to it

10 but just in case if you've got someone in the queue that'd be

11 great.

12      Length of opening statements?

13          MR. GUILLAUME:  I think five to 10 minutes for me,

14 Your Honor.

15          MR. IZANT:  And if I'm past 20 minutes, Your Honor,

16 something has gone wrong.

17          THE COURT:  So then it may be a good idea to have a

18 witness in the box because we could be done by 3:00, in which

19 case I would like to use our time.  And so you know, I'm sure

20 everyone has told you, I do push you to use every minute of the

21 day because of, you know, historically the pandemic has made it

22 such that we don't want to go home early too many days.  We

23 want to make sure the jury gets the case.

24      What have I forgotten to go over with you all?  Any

25 questions you have?

54

1        **MR. GUILLAUME:**  Court's brief indulgence, Your Honor.

2        **THE COURT:**  Sure.

3        **MR. GUILLAUME:**  Your Honor, my client had a question

4   with respect to a motion that he filed pro se.  This was back

5   months prior when he was still incarcerated and was -- I didn't

6   see anything on the docket.  I just looked a moment ago.  I saw

7   there was a notice of intent to file a lawsuit.  I see a lot of

8   the issues are similar, not exactly the same, with respect to

9   constructive possession theories and speedy trial issues.

10       So I'm in a bit of a bind.  I told Mr. Dewitt I didn't

11  file the motion, but I would ask the Court if it's in receipt

12  of a motion that he mailed to the Court.

13       **THE COURT:**  Which is the ECF No.?

14       **MR. GUILLAUME:**  It's not on ECF, which means it

15  probably wasn't docketed.

16       **THE COURT:**  Was it sent to you, Mr. Guillaume?

17       **MR. GUILLAUME:**  Was it sent to me?

18       **THE COURT:**  Yeah.

19       **MR. GUILLAUME:**  It may have been, but months ago.

20  This is around the time that Mr. Dewitt was incarcerated, and

21  he was seeking new counsel.  It's entirely possible.  I don't

22  remember it, but I'm not going to say no that he may have sent

23  it to me.

24       **THE COURT:**  So it was in, like, the September, October

25  time frame?

1          **MR. GUILLAUME:**  September he says.

2          **THE DEFENDANT:**  September 29th.

3          **MR. GUILLAUME:**  I'm looking at it right here,

4    September 29th.

5          **THE COURT:**  Let's have Mr. Ulander doublecheck the

6    docket.

7          **MR. GUILLAUME:**  Again, I just want the record to be

8    clear that it wasn't filed with counsel, although he was

9    represented at the time.  But there are certain issues that are

10   important to him that were raised in the motion and still are

11   that I didn't raise, but for purposes of the record I just

12   wanted to make clear.

13         **THE COURT:**  Well, couple of things is, Mr. Dewitt, you

14   have counsel and your counsel is able and competent.  And you,

15   as the Defendant, have certain decisions to make that are

16   yours, not your lawyer's, not anybody else's.  Those are the

17   decision to go to trial, the decision to testify if you wish,

18   you don't have to, you have the absolute right not to, and the

19   decision if you are convicted to appeal.  Everything else is

20   your lawyer's strategic decisions.

21         But that said, if there's something, Mr. Guillaume, that

22   is from that motion that you think I need to address, I'm

23   looking to you to let me know and in consultation with

24   Mr. Dewitt so that the record is clear as to what you're asking

25   me to do, I guess is the bottom line.

1          **THE DEFENDANT:**  Yes, ma'am.  What I was asking you to

2      do was file a motion which was my right to file a pro se

3      omnibus motion in this court, in your court, dealing with

4      speedy trial and also constructive possession on account of the

5      Fourth Amendment right.  And also my bail hearing, which I'm

6      being illegally detained with this ankle bracelet on me.  Okay.

7          **THE COURT:**  Let's take them in order.  You're not

8      detained.  You are on release.  You were placed on release and

9      ordered conditions from the magistrate judge.  And if there's

10     any issue with those conditions, there has to be a separate

11     motion now filed to modify.

12         I don't -- a six-month old motion on whether you should be

13     on the ankle bracelet is what we call stale.  I can't do

14     anything with it now.  So there's that.

15         So you talk to Mr. Guillaume about if there's, in your

16     view, a need to modify your conditions of release then you put

17     that in a motion to me now or to the magistrate judge and the

18     magistrate judge will review that.  So that was one.

19         Two, you said, what were the -- speedy trial and?

20         **THE DEFENDANT:**  Speedy trial issue.

21         **THE COURT:**  What was the other?

22         **THE DEFENDANT:**  Speedy trial and Fourth Amendment

23     right to be -- not be detained, you understand, illegally,

24     which my civil rights were violated.

25         **THE COURT:**  I don't understand the last one.

1          **THE DEFENDANT:**  The motion that I filed was the

2     omnibus motion dealing with the Sixth Amendment speedy trial.

3     And also a motion for my Fourth Amendment right --

4          **THE COURT:**  Let me stop you for a second.

5        Mr. Ulander, was this filed before the attorney inquiry

6     hearing?

7          **MR. IZANT:**  Your Honor, I think it was filed at ECF-29

8     and it was stricken by paperless order 30 on the account of the

9     Defendant being represented by counsel.  And the attorney

10    inquiry hearing was not until -- the notice was filed in

11    January 2022.  It was stricken in March 2022.  And the attorney

12    inquiry hearing was in -- later in 2022.

13       Mr. Guillaume, I'm scrolling down the docket now but if

14    you recall.

15         **THE CLERK:**  Your Honor, the filing I believe is

16    ECF-45, which was two weeks before the attorney inquiry

17    hearing.  ECF-45 was filed on October 12th, 2022; the attorney

18    inquiry was October 26 of 2022.

19         **THE COURT:**  So I'm not sure if I'm dealing with the

20    stricken one --

21         **MR. GUILLAUME:**  Right.  I think I just got a little

22    bit clarity.  Thank you, Mr. Ulander.  I'm confusing the two

23    things.  They're very similar arguments, though.

24       Mr. Izant is talking about the notice of intent to file a

25    lawsuit was prior to that.  This document Mr. Ulander

1  referenced was sealed so I actually never got -- I may have

2  gotten a copy.  That's why I said I wasn't sure.  They probably

3  sent me an email sealed copy.

4          **THE COURT:**  Yes, and then it was handled at the

5  attorney inquiry hearing.

6          **MR. GUILLAUME:**  I don't think it was addressed at the

7  attorney inquiry hearing.  Because at the attorney inquiry

8  hearing we hashed out our differences and some of the issues

9  were raised but Judge Simms actually caught off Mr. Dewitt when

10 he started talking about some of the legal issues.

11         **THE COURT:**  Let me ask you, Mr. Guillaume, you

12 represent Mr. Dewitt.  What's your view on speedy trial?

13         **MR. GUILLAUME:**  Your Honor, as I told Mr. Dewitt, I

14 don't think there's an issue, I'll start off by saying that,

15 under the Speedy Trial Act.

16     There was a period of time where Mr. Dewitt was arrested

17 and he was transported.  He was in Georgia, went to Oklahoma,

18 stayed there for a time before coming to Maryland in which he

19 was indicted.

20     I explained at the time in the hearing and even today that

21 under the speedy trial clock the time was not ticking at that

22 point.  There was an exception.  So I think the case was

23 brought in the appropriate time.

24     So he's upset, and understandably so, because in his mind

25 it's been a very long time since first arrest until now for a

1    variety of factors.  But we haven't challenged speedy trial

2    previously.

3        I initially drafted a motion which wasn't submitted after

4    doing more research and looking at the timeline of things.

5            THE COURT:  So, in your view, as the attorney of

6    record, there is not currently a live speedy trial issue?

7            MR. GUILLAUME:  No, I don't believe so.

8            THE COURT:  Mr. Dewitt, you're represented, which

9    means those are the kinds of motions that the lawyer is

10   responsible for bringing.  And I'm not going to opine on a

11   motion that's not before me.  I'm just not going to do it.  So

12   that's one.  I don't recall the other issue.  But it was in

13   ECF-45.  It was given to you, Mr. Guillaume, in advance of the

14   attorney inquiry hearing, while it may or may not have gotten

15   flushed out, again, my view on it remains the same.

16       Motions are a matter for the Defendant's lawyer to decide

17   what is in the Defendant's best interest.  You may not see eye

18   to eye on it, but that doesn't mean I then independently

19   entertain motions that the Defendant wishes me to.  It just

20   doesn't work that way.

21           MR. GUILLAUME:  Right.

22           THE COURT:  So I hear what you put on the record,

23   Mr. Guillaume, but I don't think there's anything for me to do.

24           MR. GUILLAUME:  I don't think so, Judge.  I think it's

25   an issue of just Mr. Dewitt is very anxious to get to trial and

1  understandably so.  The arrest happened in 2019 -- oh, the

2  arrest of Mr. Gaston happened in 2019 and that was part of his

3  thinking.

4          **THE COURT:**  Sure.  Well, it's here.

5          **MR. GUILLAUME:**  Here we are, ready for trial.

6          **THE COURT:**  We will be in trial a week from Monday.

7      Speaking of, let's do this today so we don't delay.  I

8  should voir dire Mr. Dewitt to ensure that, Mr. Dewitt, that is

9  what you really want to do is go to trial.

10     So I'm going to ask you today, as you sit here, are you

11 under the influence of any drugs or alcohol of any kind?

12         **THE DEFENDANT:**  No.  No.

13         **THE COURT:**  Are you suffering from any mental or

14 physical illness that affects your judgment, meaning your

15 ability to make decisions for yourself and understand what's

16 going on today?

17         **THE DEFENDANT:**  No.

18         **THE COURT:**  Okay.  I understand you want to go to

19 trial.  You want to exercise your right to go to trial; is that

20 right?

21         **THE DEFENDANT:**  That's a fact.

22         **THE COURT:**  And before today, Mr. Guillaume, have all

23 formal written plea offers been communicated to Mr. Dewitt?

24         **MR. GUILLAUME:**  There have been no plea offers because

25 Mr. Dewitt has always expressed his interest in going to trial.

1        **THE COURT:**  Okay.  All right.  Very well.  And,

2   Mr. Dewitt, you're not interested in a plea offer.  You wish to

3   have your trial; am I right?

4        **THE DEFENDANT:**  That's correct, Your Honor, but at the

5   meantime, like I say, I'm still being restrained with the

6   bracelet around my ankle.

7        **THE COURT:**  Well, what I suggest you do is speak with

8   your pretrial officer as well as Mr. Guillaume, and if there is

9   a motion that you wish for the magistrate judge or for me to

10  consider in terms of easing up on your restrictions, I'll

11  certainly do so, but it's not ripe right now.

12       **THE DEFENDANT:**  The reason being is, Your Honor, like

13  I say I'm out in society with no identification.  In case you

14  didn't know that.

15       **THE COURT:**  Well, I don't know that, but I'm telling

16  you that we're not going to handle that motion --

17       **THE DEFENDANT:**  All right.  Thank you very much.

18       **THE COURT:**  I need, in writing, what the reasons are

19  that the release conditions currently are too restrictive.  And

20  so speak with your counsel, if you want to put that in writing,

21  talk to the Government, talk to pretrial.  We will consider it.

22  There is a process.  And we've got to --

23       **THE DEFENDANT:**  Thank you very much.

24       **THE COURT:**  Okay.  Thank you.

25       Anything else that we need to discuss before we break?

 1          **MR. IZANT:**  No, Your Honor.

 2          **MR. GUILLAUME:**  No, Your Honor.

 3          **THE COURT:**  What I would ask you all to do is if

 4     you're going to propose an alternative to Question No. 14

 5     regarding the expert that you do so by tomorrow morning so that

 6     we can get voir dire in final form and get it back to you,

 7     okay.

 8          **MR. IZANT:**  We will.

 9          **THE COURT:**  So Mr. Ulander tells me Mr. Dewitt has not

10     been arraigned for the superseding indictment so let's do that.

11          **MR. GUILLAUME:**  Right.  Thank you.

12          **THE COURT:**  Would you let Mr. Dewitt know what that

13     process is and I'll get the superseding --

14          **MR. GUILLAUME:**  We actually spoke about it prior to

15     the court, but I will remind him.  Mr. Izant brought it to my

16     attention the other day.

17          **THE COURT:**  Okay.  So let me --

18          **MR. BUTLER:**  Your Honor.

19          **THE COURT:**  Yes.

20          **MR. BUTLER:**  Please forgive me, if I might ask for the

21     Court's brief indulgence for two minutes for me to just briefly

22     run to the restroom.  It seems like you're about to wrap up or

23     do you mind if I step away?

24          **THE COURT:**  Yes.  Unless there's somebody else, the

25     arraignment is not going to take very long.  I just want to

1   make sure Mr. Dewitt is arraigned.

2            **MR. BUTLER:**  Thank you, Your Honor.

3            **MR. GUILLAUME:**  Mr. Dewitt has to go as well.

4            **THE COURT:**  That's fine.  Come back and we'll go back

5   on the record whenever.

6            **(There was a break at 12:30 p.m. to 12:35 p.m.)**

7            **THE COURT:**  Mr. Dewitt, I want to arraign you on the

8   superseding indictment.  My first question is do you have a

9   copy of the superseding indictment?

10           **THE DEFENDANT:**  Yes, I do.

11           **THE COURT:**  Have you read the superceding indictment

12  and discussed the charges with your counsel?

13           **THE DEFENDANT:**  Yes, I have.

14           **THE COURT:**  You understand the charges that have been

15  placed against you.

16           **THE DEFENDANT:**  Not really.

17           **THE COURT:**  What does that mean?

18           **THE DEFENDANT:**  What I mean is I understand they are

19  false charges.

20           **THE COURT:**  Well, you may not agree with them, but my

21  question is do you understand what the Government is saying you

22  did, the indictment, the grand jury is saying you did?

23           **THE DEFENDANT:**  Yeah, my attorney explained it to me.

24           **THE COURT:**  Okay.  All right.  So I'm going to go

25  through with you each one and give you the maximum penalties

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1 for each one as well as advise you of your rights that attach

2 when you're charged by indictment.  Okay.  You stop me if you

3 have any questions and if you need any more time with

4 Mr. Guillaume you let me know and I'll give you your time,

5 okay.  All right.

6      First is, you have been charged in Count 1 of the

7 superseding indictment with conspiracy to distribute and

8 possess with intent to distribute a mixture and substance

9 containing a detectable amount of fentanyl; a mixture and

10 substance containing a detectable amount of heroin.  And that

11 the amounts involved in the conspiracy as a result of your

12 conduct or conduct of other conspirators that was reasonably

13 foreseeable to you was at least 400 grams or more of fentanyl,

14 or a mixture containing a detectable amount of fentanyl; and a

15 mixture and substance containing a detectable amount of heroin.

16      Do you understand the charge in Count 1?

17           THE DEFENDANT:  I read it but I don't understand it,

18 Your Honor.

19           THE COURT:  What part of it don't you understand?

20           THE DEFENDANT:  The fact is that I never possess

21 any --

22           THE COURT:  I'm not asking for whether you did it.

23 I'm asking if you understand the charge?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Okay.  The maximum, I'm going to give you

1   the maximums and the minimums on this charge.  The minimum
2   imprisonment term is 10 years to lifetime imprisonment.  The
3   minimum term of supervised release, which is like probation, is
4   at least five years, follows prison, up to lifetime supervised
5   release.
6        There is a 10 million-dollar fine.  That's the maximum.
7        And there's a 100-dollar special assessment.  The special
8   assessment is a court cost.  It's due and payable if you are
9   convicted before sentencing.
10       Do you understand the mandatory minimums and maximums
11  associated with Count 1?
12             **THE DEFENDANT:**  Yes, I do.
13             **THE COURT:**  Okay.  You're also charged in Count 6, use
14  of any communication facility to facilitate a drug felony in
15  violation of 21 U.S.C. 843(b).
16       Do you understand that charge that has been placed against
17  you?
18             **THE DEFENDANT:**  Yes, I do.
19             **THE COURT:**  Okay.  The maximum term of imprisonment on
20  this charge is four years, maximum term of supervised release
21  is three years.  There's a maximum fine of $250,000 and a
22  100-dollar special assessment.
23       Do you understand the maximum penalties associated with
24  Count 6?
25             **THE DEFENDANT:**  Yes, I do.

1        **THE COURT:**  Now, I'm going to go through Counts 7, 8,

2   9 and 10 with you.  You're charged in each.  The maximums for

3   each count are the same, and they're the same as what's in

4   Count 6.  So I'm going to go over each count with you, make

5   sure you understand what you're charged with, and then go over

6   once the maximum penalties that are associated with each.

7        You follow me?  Yes?

8        **THE DEFENDANT:**  Yes, I do.

9        **THE COURT:**  Okay.  Count 7, you're charged with use of

10  any communication facility to facilitate a drug felony.  And so

11  the record is clear, the difference between 6 and 7 is that

12  in -- what is the difference, Counsel?

13       **MR. IZANT:**  The time of the communication.  They each

14  charge a different communication.

15       **THE COURT:**  I see it.  So the difference between 6 and

16  7 is, 6, Mr. Dewitt, charges you with using your cell phone on

17  September 4 at 3/20/19 at 3:25.  Count 7 charges you with using

18  your cell phone on September 4, 2019, at 5:32.

19       Do you see that?

20       **THE DEFENDANT:**  Yes, I see it.

21       **THE COURT:**  Otherwise, the elements for Count 6 are

22  the same as 7.  Do you understand that?

23       **THE DEFENDANT:**  Yes.

24       **THE COURT:**  Okay.  Count 1, another use of any

25  communication facility to facilitate a drug felony.  Same as 6

1   and 7, charging you with a different communication.

2   September 6th, 2019, at 1:24 using the same cell phone as

3   before.

4        Do you understand the charge in Count 8?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Count 9, use of any communication facility

7   to facilitate a drug felony.  Same offense as 6, 7 and 8,

8   except it charges a different communication; September 6th,

9   2019, at approximately 2:37 p.m.

10        Do you understand the charge placed against you at Count

11  9?

12            THE DEFENDANT:  Yes.

13            THE COURT:  And Count 10, another use of any

14  communication facility to facilitate a drug felony.  This

15  charges the communication on or about September 12, 2019, at

16  approximately 2:50 p.m. using the same cell phone.

17        Do you understand the charge placed against you in Count

18  10?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Okay.  As I mentioned earlier, each of

21  these counts carry the same maximum penalties.  That's four

22  years in prison, three years of supervised release, and a

23  250,000-dollar fine as well as each having a mandatory

24  100-dollar special assessment, which is a court cost, if you're

25  convicted it is due between conviction and sentencing.

 1          Do you understand the penalties associated with each of

 2   the counts to which you've been charged?

 3                THE DEFENDANT:  Yes, ma'am.

 4                THE COURT:  And you understand the nature of the

 5   charges, correct?

 6                THE DEFENDANT:  Yes.

 7                THE COURT:  All right.  I'm going to ask Mr. Ulander

 8   to place you under oath and then I'm going to take your plea.

 9                THE CLERK:  Please raise your right hand.

10          (Defendant sworn.)

11                THE CLERK:  Thank you.  You may put your hand down.

12          Please state your full name for the record.

13                THE DEFENDANT:  Valfonso Dewitt.

14                THE CLERK:  What is your age?

15                THE DEFENDANT:  Seventy-four.

16                THE CLERK:  And in what year were you born?

17                THE DEFENDANT:  1948.

18                THE CLERK:  Have you been furnished with a copy of the

19   superseding indictment by the United States Attorney?

20                THE DEFENDANT:  Yes.

21                THE CLERK:  Have you read the superseding indictment?

22                THE DEFENDANT:  Yes.

23                THE CLERK:  Do you understand the charges which have

24   been placed against you?

25                THE DEFENDANT:  Yes.

1          THE CLERK:  Mr. Guillaume, you represent the

2  Defendant, are you satisfied he understands what he's charged

3  with?

4          MR. GUILLAUME:  Yes.

5          THE CLERK:  Mr. Dewitt, you've been charged in Counts

6  1 and 6 through 10 of the superseding indictment.  What is your

7  plea?

8          THE DEFENDANT:  Not guilty.

9          THE CLERK:  The plea is not guilty to all counts; is

10  that correct?

11          THE DEFENDANT:  That's correct.

12          THE COURT:  All right.  And you already know this,

13  Mr. Dewitt, but I'll make sure we're clear for the record.  You

14  have the same rights on this superseding indictment as you do

15  on the original indictment, that is the right to a trial, the

16  right to a jury trial, the right to be represented by able and

17  competent counsel if you can't afford one, and the right to be

18  considered for release.  And we talked about all of those

19  rights earlier.

20      Anything else?  Any questions or concerns with regard to

21  the arraignment?

22          MR. IZANT:  No, Your Honor.

23          MR. GUILLAUME:  No, Your Honor.

24          THE COURT:  Okay.  All right.  Anything else we need

25  to do today?

1          **MR. IZANT:**  No.  Thank you, Your Honor.

2          **MR. GUILLAUME:**  No.  Thank you, Your Honor.

3          **THE COURT:**  See you all a week from Monday.

4          **THE CLERK:**  All rise.  This Court stands adjourned.

5      (Court adjourned at 12:42 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

     I, Ronda J. Thomas, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

                    Dated this 14th day of February 2023.


                    _____
                         Ronda J. Thomas, RMR, CRR
                         Federal Official Reporter

Ronda J. Thomas, RMR, CRR - Federal Official Reporter